MONROE, C. J.
Plaintiff sues for damages, direct, consequential, and punitory, to an amount exceeding $100,000, said to have been sustained in the destruction of and injury to certain of its timber as the result of the methods pursued by defendant in the extraction of turpentine therefrom, whilst operating under a written contract of lease, the terms and conditions of which it is alleged to have willfully, maliciously 'and in bad faith violated. Defendant denies that it willfully and negligently violated the contract in question, but admits (partly in its answer and partly in the brief of its counsel) an indebtedness to plaintiff of $3,223.42 arising from its failure to discharge certain of its obligations, and, upon the other hand, alleges that plaintiff is indebted to it upon various accounts growing out of the contract in sums exceeding in the aggregate the amount sued for, and it prays for judgment therefor in reconvention. The court a qua gave judgment for plaintiff in the sum of $8,552, and rejected the demands in reconvention, and, defendant having appealed, plaintiff has answered praying for an increase of the award, in its favor.
The contract sued on bears date December 28, 1910, and, in so far as it need be here quoted or stated, provides:
“That the said Lee Lumber Company, Limited, is the owner of the timber upon the hereinafter described lands, and, as such owner, has leased unto the said Union Naval Stores Company * * * all the pine timber suitable for turpentine purposes upon said lands, which are described as follows, to wit: [Then follows a description of various tracts of land which are said to contain, in the aggregate, some 18,000 acres, and which are divided into ‘virgin’ and ‘cut-over’ lands].”
It is declared that the lease is made to enable the Naval Stores Company to cup, work, and operate the timber for turpentine and resin; that the lumber company binds itself to maintain the Naval Stores Company in possession, and that the Naval Stores Company binds itself to work the timber for turpentine until it shall all have been worked and the agreed rental paid; that the lease begins upon its date, and shall continue until the timber suitable for turpentine purposes upon each tract shall have been operated for three years, to begin, with reference to each tract, with the beginning of operations thereon; that the lumber company shall on or before January 1, 1911, designate-in writing the lands to be operated for that year, and shall make similar designations for succeeding years, on October 1st of each preceding year, provided that not less than 1,500 nor more than 4,000 acres shall be so designated for any one year, it being understood' that the Naval Stores Company is to pay rental upon all lands designated each season; that the lumber company' shall have the right to withdraw such lands as it may desire from the operation of the lease, upon certain conditions which are specified:
“This lease is made for eight cents a cup on timber classified as ‘virgin lands’ and six cents a cup on timber classified as cut-over lands, *505 which rental shall be paid in full as soon as cups are installed, payments to be made on the 1st day of each month during the installation period for all cups installed during the preceding month, * * * which rental shall be full consideration for three years’ operation upon all tracts or portions of tracts upon which the same has been paid, and upon which rental said Union Naval Stores Company has paid the sum of $17,500, cash in hand, the receipt of which is hereby acknowledged, and which payment shall be applied to all cups first installed * * * under this lease, and said * * * company shall make no further payment until said first payment of $17,500 shall have been exhausted.”
That the Naval Stores Company shall employ the cup and gutter system, “and that its system of operations shall be the most modern and approved; that no less than four-inch space shall intervene between each chipping upon any tree, and that not more than three cups shall be installed upon any one tree in any one season, and that no tree shall be penetrated to a deeper depth than one inch in scarring the trees, better known as ‘chipping,’ and that, in fine, said turpentine operations shall be conducted by said * * Naval Stores Company in a manner least likely to injure said trees and to detract from their value in [for] milling and lumber purposes, and also said * * * company shall closely operate all timber suitable for turpentine purposes upon said premises, placing as many cups to each tree as the same can hold with due regard to the safety of the tree, in order that said Lee Lumber Company, Limited, may obtain full rental for all timber upon said leased premises, but not to exceed, as aforesaid, three cups to each tree.
“That, in the event of any tree dying upon said leased premises, during the life of this lease, unless such tree dies from some other apparent natural cause than the result of turpentine operations, such tree shall be immediately cut, felled, and hauled by the Union Naval Stores Company to the Tioga & Southwestern Railway Company’s track, at a convenient point for loading thereon, to be shipped to the said Lee Lumber Company, Limited, or, in lieu thereof, at the option of said Union Naval Stores Company, the said * * company may pay said * * * lumber company the value of said tree, at the price of $4 per thousand feet.
“The said Union Naval Stores Company does hereby guarantee said * * * lumber company against all injury, damage, and loss from fire upon any of the timber herein described resulting from turpentine operations during the life of this lease, and binds and obligates itself, in the event of any loss, damage, or injury caused by such fire or fires, to reimburse said Lee Lumber Company to the full extent of such loss, * * * and said * * * Naval Stores Company further obligates itself to rake around the trees being operated upon, once each year, during the continuation of this lease, and to use and exercise every reasonable precaution against the occurrence of fires upon said leased premises.”
There is then a reservation to the lumber company of tbe right to cancel the lease with respect to certain described tracts, upon making reimbursement, and other stipulations which are not involved in this suit.
The petition contains a general allegation to the effect that defendant ignored its obligation to conduct its operations as a prudent administrator and with proper regard for the protection of plaintiff’s interest as the owner of trees intended to be sawed into lumber and so sold on the market, which allegation is followed by numerous specifications of methods of operation which, it is alleged, were in violation of the letter or spirit of the contract, or both, and, separately and collectively, tended to kill and did kill a large number of trees, reduce others to a dying condition, and subject plaintiff to tbe loss of the lumber which might have been obtained from them, to wit:
That in many instances defendant chipped “faces” upon the trees which exceeded 14 -inches in width; that the “chipping” was frequently more than one inch in depth and penetrated through the sap to tho hearts of the trees, and that upon some of the trees more than three faces were chipped and three cups hung; that many trees were bled more than once a week; that in many instances the bark spaces or “bars” between the faces were less than 4 inches in width,- and not unfrequently wore cut away entirely; that in many instances trees were chipped and bled which should have been left untouched, because too young to bear such operations or disabled and weakened from age or other causes, but were still available for sawmill purposes; that defendant failed to use proper precautions for the protection of the forest from fires; that it so operated in some instances as to create “dry-faced boxes”; that it failed to provide an expert to designate the trees to be operated on, the number of cups to be hung on each tree, etc., and turned loose on plaintiff’s holdings a horde of unskilled, irresponsible, and reckless negro laborers, whose sole apparent motive was to increase their wages by installing as many cups and doing as much chipping as possible, without regard to the safety of the trees.
“That, in fine, instead of said Union Naval Stores Company’s system of operations being the most modern and approved, and instead of its turpentine operations being conducted in a manner least likely to injure said trees and detract from their value for milling and lumber purposes, the system of operation adopted and pur *507 sued by said Naval Stores Company was the crudest and most destructive, and its turpentine operations Were conducted in a manner most likely to injure said trees and to detract from their value for milling and lumber purposes, and that, instead of operating petitioner’s forest, said Union Naval Stores Company butchered it.”
Plaintiff obtained a preliminary injunction restraining defendant from operating the timber in question in violation of the provisions of its contract, and defendant thereupon abandoned the enterprise.
At the inception of the trial plaintiff moved that experts be appointed, one to be selected by it, one by defendant, and one by the court, with instructions to “cruise” the forest and report the number of trees found dead in the turpentine region, the causes of death, the lumber contents of the trees, etc., which motion was opposed by defendant. The court sustained the motion and appointed an expert named by plaintiff, and another of its own selection, but defendant, holding that the appointments were unauthorized, declined to name the third, and the two so appointed thereupon made their cruise and report, which latter plaintiff moved to homologate. The motion was not sustained, and, as the appointees testified merely as expert witnesses called by plaintiff, the question whether their appointments by the court were authorized need not be determined.
It is shown beyond dispute that the “gutter and cup” system used by defendant is regarded as the most modern and approved; that the force employed was provided with a superintendent, or manager, and four inspectors (for, say, 35 laborers); and that the laborers were negroes who were experienced in the work and devoted themselves to it, and, save as indicated by the result, there is nothing to show that they were unskilled or irresponsible. The evidence develops but few specific instances of too frequent bleeding, or dry-faced boxes, or of more than three cups to the tree, but many in which the chipping was too wide, or too deep, or both, in which the bars which should have been left four inches wide between the faces were of less width, or were cut away entirely, faces were chipped against cat faces, trees of from six to ten inches in diameter, and trees that were suffering from disease, or the vitality of which was lowered from other causes, were chipped and bled when they should have been left untouched; and all of the causes thus mentioned, whether in particular instances they were few or many, as also deaths from lightning, fire, infection, and no apparent natural causes, were to be taken into consideration in determining how many of the whole number of trees found dead in the turpentine area had died by reason of the turpentining operations, and it was then necessary to ascertain the lumber contents of the trees that so died in order to fix the liability of the defendant therefor. With a view of making the required proof, plaintiff called nine witnesses, of whom five (including its president) were presumably upon its pay rolls, whilst the others had no other connection with it than their employment to cruise its forest in search of the information needed in this case. Most, if not all, of them were born in pine forests, had lived in them, or in their vicinity, all of their lives, and had been engaged for the greater part of that period in logging, milling, estimating, buying, and selling pine timber. L. H. Mizell, who had been selected by the trial judge as an expert, testified, in substance, as follows concerning his qualifications, to wit: That he was born and reared in the pine woods; was 36 years old (in 1914); had been logging, milling, and estimating for the past 12 years, during which time he had done that work for a great many of the large concerns in the state, the names of which he gave; that he was familiar with the nature and properties of pine trees, had seen turpentine operations since he was a small boy, but did not know a great deal about them. Where *509 upon defendant’s counsel made the objection that he was not an expert, and they say in the brief filed by them in this court (referring to Mizell and another):
“They failed to qualify as experts, and their testimony and report should, in our opinion, be given only such weight as 'would be attached to that of any other ordinary woodsman, and not the weight that should be attached to that of the turpentine operator.”
It is difficult for us to realize that the passage thus quoted was intended seriously. The witnesses to whom it refers are not ordinary woodsmen; they are men who have been graduated into the profession of estimators, a profession upon the judgment of whose members it may safely be said that almost all of the vast timber holdings of this state have heretofore changed, and are now from time to time changing, hands. Not only that, but it is shown that, as a preliminary or incident to the acquisition of the faculty of determining on view the quantity of lumber likely to be obtained from a standing tree, those witnesses spent parts of their lives in felling trees in the woods, in cutting them into logs of such lengths as particular occasions required, in hauling or' floating them to mill or to market, in sawing them into lumber and selling the lumber, from which experiences they learned of the many things which may affect a tree injuriously and impair its value for milling purposes, or threaten it with death, thereby rendering it necessary to hasten its conversion into lumber, and became proficient in the art of determining for all the purposes of the lumber business, its board measure contents when so converted. If, then, they are not experts in those matters, we are satisfied that no such experts can be found. The suggestion that a turpentine operator would be better qualified for that position is not supported by- anything in the record in this case or within the range of our information. As we understand it, such operators usually lease the timber of others, for turpentine purposes, and have no other interest in it than to extract therefrom the greatest possible quantity of turpentine (which, while in the tree, is called the sap, and is the lifeblood of the tree); and, save in so far as they are bound to the owners by their contracts and are interested in obtaining the sap (which, when extracted from the tree, is called turpentine), it is a matter of no concern to them whether, at the end of the three years for which such contracts usually run, the trees live or die. Their interest would therefore seem to pull in one direction, and the obligations of their contracts in the other, and, unless they are differently constituted from the ordinary men of business, it may be imagined that they do not strain themselves to find reasons, in the interest of the trees and their owners, why they should not get 70 instead of 50 barrels of turpentine from a “crop” (of 10,000 cups). In order to show the number of the plaintiff’s trees that died as the result of its turpentining operations, and their contents in lumber, defendant called three of its employes, to wit, Messrs. Gillis, Ballentine, and Holland, to which list was added Mr. Pringle, a former employe, who took some little part in the operations under the contract sued on, and Mr. Byrd, who had been in defendant’s employ for three years and up to within “a month or so” of the time of giving his testimony.
Mr. Gillis, being asked, “What is your business? How long have you been in that business?” and “Ever in any. other business?” answered, “Naval stores turpentine business “I was born in it; my father was an operator before me“No, sir.”
Mr. Pringle testified that he was 35 years old, that he was in the turpentine business, and had been so engaged for 30 years, and it does not appear that he was ever engaged in any other business. Mr. Holland testified that he had been in the employ of defendant *511 for 13 years “as landman, timber estimator, and also as turpentine estimator,” and that lie bad been engaged in timber estimating “more or less” for 26 or 28 years. What timber estimating bad been required of him by defendant does not appear. Mr. Byrd was 32 years old, occupation, surveyor and timber cruiser; had been engaged in turpentining and timber estimating for 19 years. What timber he had been called on to estimate is not shown. Mr. Ballentine was 36 years old; had been in defendant’s employ 4 years. His testimony as to the business in which he had been engaged, experience in determining the causes of sickness and death among pine trees, and in estimating the probable quantity of timber in standing trees is about as follows:
Speaking first of the work done by him during the 4 years of his employment by defendant he says:
“The majority of my work has been done outside in the woods. 1 have office duties in connection with it, getting- up reports, and I keep track of the taxes of all land owned by the Union Naval Stores Company. Q. What part of the work have you done outside? A. Working in the surveying and estimating. Q. What has been your business all your business life? A. Land work, and in connection with that land work I have done work for a railroad company. Q. What kind of work? A. Surveying, leveling— transit work and leveling work both.”
On cross-examination:
“Q. When did you begin your business life? A. When I was 17 years old. * * * My first work * * * [was] with my father — he was an engineer — in working on a right of way for a narrow-gauge railroad. * * * Q. How long before you began any work connected with pine timber? A. I didn’t have anything to do with pine timber until about five years after that. Q. What was your work in connection with pine timber there [then]? A. Surveying at first; surveying wholly. Q. When did you begin to estimate timber? A. About 12 years ago. Q. For what company did 3rou work? A. Por Russell Sage timber. Q. For how many companies have you ever estimated? A. About eight, I should say, offhand. * * * Q. Ever cut logs? A. No, sir. Q. Ever sawed logs? * * * You mean by cutting the tree down and topping it? Yes; I have done that. Q. Much of that? A. No, sir. Q. Ever been engaged in the manufacture of lumber? A. No, sir. Q. I mean as owner or emplo3"é? A. No, sir. * * * Q. Did 3rou estimate tracts for the Union Naval Stores Companies before they purchased lands? A. Yes, sir; I have done so. Q. That is what you are usually employed for, is it? A. My most usual employment is in the surveying lines, sir. Q. Surveying and locating the lands? A. Surveying and locating. Q. Whenever they have a tract to estimate they usually send 3’ou? A. They usually send Mr. Holland. Q. When you go out to estimate, do you estimate the quantity of feet, or how many cups can be put? A. No, sir; the stumpage. I have made one or two cup estimates. I am not as familiar with turpentine operations as with stumpage and timber.”
The contract sued on was entered into, as we have stated, on December 28, 1910. Thi,s suit was instituted on December 23, 1912; and on January 14, 1913, Messrs. BaHentine, Holland, and Byrd 3vent into the turpentine forest to obtain the information necessary to its defense. Mr. Ballentine was engaged in the field work for 14 days, less two Sundas's and one day when it rained, and spent the last three days of January in preparing an elaborate report, which has been filed in evidence (though objected to by plaintiff’s counsel). Mr. Holland testifies that he remained in the camp for six or seven days, that Mr. Byrd was there during that time, and that the method of operating was for Byrd and himself to take the diameter of the dead trees in the turpentine area 3vith calipers, estimate the height and taper, make the proper deductions, and call out the board measure contents to Ballentine, by whom the figures so called out were noted, and that, mutatis mutandis the same method was pursued in ascertaining—
“the width of the faces, depth of the chipping, width of the bars between the faces, and the manner in which the timber was worked.”
At another place in his testimony, he says:
“I measured some of them (meaning the trees in section 42). Mr-. Ballentine measured the majority of them, right in my presence.”
Mr. Byrd testifies that a Mr. Boll (since dead) was of their party; that he Uvitness) and Holland calipered the trees, Bell took *513 notes of the contents, which were communicated to Ballentine, who noted them for his report. He says that at times he worked with Bell alone, when Ballentine was absent,- and gave the results to Ballentine after-wards ; and it appears that they averaged the width of the faces and the bars and the depth of the chippings.
Mr. Ballentine gives the following, with other testimony:
“Mr. Holland estimated the trees that he measured. Mr. Byrd estimated the trees measured by him. I was with them, and in the event it didn’t look good to me, the amount arrived at, we would remeasure the tree. This didn’t happen very often, because both of them were very competent men. * * * With very few exceptions, we agreed on the amount of stumpage in any given tree. * ;f I would strike a course through the woods, and they would work on either side of me. Q. And they would call out the figures to you? A. Yes, sir. * * * Q. Did you go and verify any of the figures, and see for yourself if they were correct? A. No, sir; if I had to do that, I would not have had them along, if I had not had confidence in them. * * -:= Q. As I understand, you did very little of the estimating and measuring; you took the notes? A. I took most of the notes, and was estimating for my own satisfaction to confirm the estimates made by my associates, tree by tree. Q. You would make a mental estimation_ and calculation yourself, then, without measuring? A. Yes, sir. Q. And they would make an actual measurement, and in nearly every instance you would agree? A. Yes, sir. Q. Does not that rule follow where an experienced estimator can ascertain the quantity of timber without measuring it? A. Not necessarily. Q. How is it that you hit so closely from your own when your estimating didn’t agree with the actual measurements was so rare as to excite curiosity? A. That was because I had worked with them. Q. You understood their peculiar methods? A. Not necessarily peculiar; every man has his peculiarities. Q. You mean, when you see Mr. Holland going to a tree equipped with calipers, scale, and rule, you can tell pretty well in advance what figures he is going to make out and the total figures on that tree? A. No, sir; but I could follow pretty closely Mr. Holland’s train of thought when he approached that tree. * * * If I have given you the impression that I knew just what he was going to say, it is a misimpression. But, knowing him, I knew what points of the tree he was taking into consideration. Following that same line of thought and basing my mental estimate on similar deductions, similar to those being deduced by Mr. Holland of his observation of the same tree, I made a mental estimate which struck very close, in nearly every instance, to the estimate made by Mr. Holland after he had calipered the tree, ascertained its diameter, and computed the superficial (?) contents according to the Doyle stick. * * * Q. Now, pardon me for referring again to Mr. Holland’s method of estimating, but I would like to ascertain from you if his methods of ascertaining the contents of a tree are different from those of any other skilled, competent, and honest estimator? A. They are not different _ from the methods employed by any other skilled, intelligent -estimator, using the Doyle stick method of estimation.”
The witness then admits that the height of the tree, the point at which the diameter ran down to 8 inches, the number of logs of 16 feet and odd lengths into which it might have been cut, the allowance made (in determining the contents) for hollows, butts, red hearts, doty tops, big cat faces, and torn sides, were all mattérs of estimation, based on experience, but he thinks that the base diameter was the most important factor in the calculation. Upon that subject, however, he testifies that in taking the diameter of the turpentine trees with the calipers the determination of the proper place to apply the calipers was a matter of judgment, as it might happen that two bark surfaces opposite each other, and otherwise properly situated with reference to the shape of the tree, could not be found, and that in such case the measurement might have been taken from the bark on one side to a face on the other, and possibly, though not probably, from a face to a face, in which latter event the loss, it is said (according to the Scribner-Doyle rule of measurement), would amount in a 20-inch tree to 25 per cent, of the output.
Another point in the testimony of Mr. Ballentine which attracts attention is that he reports 1,931 turpentined trees as having been found dead, and (in his report) he ascribes the death of only 329 of them to the turpentine operations, of 889 to various causes, said to be apparent, and of 713 to causes said to be nonapparent. It is hardly necessary to say that the 1,931 trees must have been alive *515 when defendant began operations under the contract, as one would hardly undertake to extract turpentine from a dead tree, and, as it seems remarkable that so few of them should have died from other causes than'the treatment which they received in those operations, and more particularly that 713 should have died from no apparent causes, defendant’s counsel asked the witness, who had stated that the average life of the dead trees was approximately 175 years, the question:
“Can you account why those 706 trees [713 appears in the report, but there is perhaps an explanation of the difference in the testimony] that died from nonapparent natural causes out of the total dead of 1,931 from all causes stood there for an average life of 175 years, and then suddenly collapsed and went out of- existence during two years of turpentine operations?”
And the answér was: “No, sir.”
Another thing that he was frankly unable to account for was how it happened that a considerable number of trees died from infection conveyed from trees that had died from various other causes and very few from infection conveyed from those which had succumbed to turpentining.
Referring to the manner in which he and his associates arrived at the various causes of death and determined in cases of infection whether it came from one dead tree or fallen limb or another, the witness testifies as follows:
“Q. You must have found those trees rather perplexing problems? A. No, sir; we didn’t allow them to perplex us. We endeavored in evei-y instance where it was possible for human intelligence to determine the [cause of] death of the tree to do so. When we decided that it could not be determined, we made a note that it died from nonapparent natural cause. Q. Did you' study them carefully? A. Yes, sir. Q. Discussed ‘them between you? A. Not in every instance. In some instances, however, this discussion was made, and, in a few instances we found that two pairs of eyes were better than one; in other words, I might see something in the tree that had escaped the attention of the others, but those instances were rare.”
To which, we may add that, whether the question of the cause of the mortality among the trees was decided by one or the other of the party, or by all of them, after discussion, it is evident that the decision was dependent upon the judgment of him, or those, by whom it was given, and in no wise upon the use of calipers. We may further add that all trees found to have died from no “apparent natural cause” were charged to the account of the plaintiff, though the contract, in express terms, declares that such trees shall be immediately felled by defendant and delivered at some point on the railroad for shipment to plaintiff, or else paid for by defendant at the rate of $4 per 1,000 feet. And finally on this particular branch of the case, we note that at the close of Mr. Ballentine’s testimony, after the following questions and answers:
“Q. As to those sources or lines of infection, the court must rely upon the judgment of the witness or various witnesses? A. In so far as our data is concerned,”
- — defendant’s counsel made the following announcement:
“I want to say in reference to Mr. Overton’s remarks about the witness on the stand (referring to certain objections to the introduction of the report prepared by the witness, on the ground that he had not been appointed as expert, and that the report had not been made entirely by him or based upon original information) and reply to the objection to the evidence that I didn’t offer Mr. Ballentine as an expert, but as a witness of the facts, though I admit that Mr. Overton more than qualified him as an expert.”
Our conclusion is that the reliance which defendant’s learned counsel seem to place upon the report and testimony of Mr. Ballentine as a scientific exposition of the matter to which they relate is not well founded. We intend no reflection upon Mr. Ballentine’s sincerity of industry, but both his report and his testimony are based so largely upon mere matters of judgment, and not always his own, and so little upon anything that approaches either a scientific process or conclusion, that they are entitled to respect merely as the report and testimony of a witness who, with no intention to misrepresent, has fallen into some *517 quite palpable errors, not the least among which is the theory, upon which he proceeded, that he could arrive at the mortality among the trees resulting from improper chipping by averaging the width and depth of the chippings and the width of the intervening bars, according to which theory it may very well have happened that no trees should have died from that cause though one-half of them had actually done so.
In his tabulation of the conditions as found by him (in January, 1913) he shows 1,931 trees dead from all causes, of which he reports 713 as dead from no apparent causes, and 329 as killed by defendant’s operations, with a loss of 130,730 feet in stumpage, but in his .“Remarks” (extended opposite those figures) he says:
“Admitting for the sake of argument, that the Union Naval Stores Company is responsible for all the dead timber save that killed by known natural causes, then their original liability would have been 424,135 feet, and their present liability but 805,856 feet.”
It was agreed upon the trial that plaintiff should be permitted to introduce evidence to establish all damage sustained by it as the' result of defendant’s turpentining operations up to the date of the trial and within the amount originally claimed or that might be claimed , by supplemental petition.
Mizell and Bradford cruised the turpentine territory in June, and up to July 3, 1913, six months after Ballentine and his associates had finished their work, and, without giving the number of dead trees, reported the loss of stumpage from turpentining at 1,817,130 feet. Merritt, plaintiff’s woods superintendent, with L. D. Corley, in January, 1914 (while the trial was in process), made a cruise which did not cover the entire turpentined territory, and reported a loss of stump-age attributed to defendant’s operations of 2,756,000 feet. F. A. Mallory, W. E. Lawrence, and J. C. Corley also examined a portion of the turpentined area in January, 1914, and found the loss of stumpage attributed to the same cause to be 2,871,800. B. F. Lewis, called by plaintiff in rebuttal, reported 2,052 trees dead as the result of defendant’s operations, but made only a partial report concerning the loss of stumpage.
In their latest brief defendant’s counsel say:
“As we have already asserted in our original brief, and as we desire to reiterate and emphasize, Ballentine’s report is the only one which is sufficiently reliable to form the basis of a judgment, and the judgment in this case should be x-educed to the sum of $3,223.42, calculated on the basis of the result found by him and his associates, with the more than generous addition of 90 per cent, to cover the amount of loss between the date of his cx'uise, Januax-y, 1913, and the date of the trial, January, 1914. * * * It is conceded by both sides that 90 per cent, should be added to Ballentine’s total to cover the year intervening between the date of his cruise and the date of the trial, and it is ax-gued further that 45 per cent, should be added to Mizell’s and Bradford’s estimate, whereas the district judge added very much less than this. The fallacy of this argument lies in this (and the judg-e a quo probably realized it), that practically all the deaths resulting from turpentine operations, we believe, occur when the sap rises, which is in the spring, and that, as Mizell’s and Bradford’s estimate was made in June, almost all the, deaths that could occur up to the date of the trial had already taken place.”
Upon the other hand, counsel for plaintiff say:
“The trial judge states in his opinion that we agreed to this pex-centage (presumably in oral argument). We have not the slightest recollection of such a statement made by us, but we are willing to accept it as correct, although it is exceptionally generous to the defendant, for the yearly death increase is away and beyond any 90 per cent. The defendant made this calculation by averaging, on its own figures, the increased one year’s death in section 42, * * * which was the best turpentined section, and the Holloway Prairie crop, which is the worst turpentined. The trouble with the calculation is that section 42 is exceptionally fine, in comparison with the rest of the orchard. And the Holloway Prairie is not exceptionally bad in comparison with the rest of the orchax-d.”
■ The judge a quo expresses his faith in Mizell’s work, and l’eached the conclusion that his report came about as near to the *519 truth as is practicable in a case of this character, and, after an exhaustive consideration of the testimony which was adduced, and which swells the transcript to uncommon proportions, we have reached the same conclusion. Our learned Brother, however, after thus expressing himself, proceeds as follows:
“So, if we take Mizell’s estimate of the timber loss and damage at 1,817,000 feet and add thereto 400,000 feet, which is considerably less than 45 per cent., it would bring the total to 2,217,000 feet, which, at $4 per 1,000, would make $8,868. Deducting therefrom the amount of $316, admitted to be due to the defendant, on its rcconventional demand, leaves $8,552, * * * which plaintiff is entitled to recover.”
And there was judgment accordingly.
To he somewhat more exact, Mizell found the loss of stumpage to be 1,817,130 feet, and we find no sufficient reason for not following up our faith in the comparative correctness of that estimate to its logical conclusion and the less so as we feel satisfied that it is rather an under than an over estimate of the real loss. I-Ience we are of opinion that the full 45 per cent, should be added, as representing the additional loss sustained during the six months that intervened between Mizell’s cruise and the trial of the ease; so that we have 1,817,130+817,708=2,634,83S, as representing the loss in stumpage, which, at $4 per 1,000 feet, makes the loss in money $10,-539.40, and, deducting therefrom the $316, we find the net balance due to plaintiff to be $10,223.40. The “belief” of defendant’s learned counsel that practically all the deaths resulting from turpentine operations occur when the sap rises may be well founded, but' there is no evidence to that effect in the record, and the impression that we have is that a tree can be said to be dead only when the sap fails to rise, and hence that the death may occur between one spring and the next.
Plaintiff, in answering the appeal, prays that the amount of the award be increased to the sum originally demanded, but in the argument limits its demands to the following;
(1) That it be allowed $8.83 per M for the timber shown to have been lost by reason of defendant’s operations, as the net value of the same when converted into lumber, or, in the alternative, that it be allowed $6 instead of $4 as the stumpage value.
(2) Expense incurred in extending time contracts by reason of the fact that it was compelled to abandon the cutting of timber on certain leased tracts in order to save the timber on tracts operated by defendant and which was threatened with immediate destruction.
(3) Punitory damages.
(4) Deterioration of timber, which was not dead or dying, but which was injured by defendant’s operations and turned out inferior lumber, at au increased expense.
(5) Expense incurred in the employment of counsel to obtain the writ of injunction herein issued.
(6) That there be included in the estimate of lost timber 180,000 feet, representing timber that was felled and hauled by defendant for shipment to it, in accordance to the terms of the contract, or was felled, and not hauled, and was lost because felled and hauled too late, or, being felled, was not hauled.
[1-3] The claims represented by the items 3, 2, and 3 are predicated upon the allegations of the petition that defendant violated the contract sued on willfully, maliciously, and in bad faith, but we do not find those allegations to have been sustained by the evidence. The presidents of the litigant corporations, respectively, appear in this' record as fair-minded, honorable men, neither of whom had any intention of seeking an unfair advantage of the other, and the failure of the defendant to comply with its contract seems to have resulted from bad work on the part of a particular employe of the defendant, and not bad faith on the part of the corporation as rep *521 resented by its governing officials. We are therefore to deal with the case as one in which the recoverable damages are those which may be supposed to have been within the contemplation of the parties when the contract was entered into, and from that ■point of view, and because the contract itself specifies the amount to be paid for timber killed by defendant’s operations, and not immediately felled by it and delivered for shipment to plaintiff, and also because it has recently been held by this court that our system of law does not authorize the infliction of punitory damages in civil suits (Vincent v. Morgan’s R. & S. S. Co., 140 La. 1027, 74 South. 541), the items above mentioned may be regarded as eliminated from further consideration. As to item 4, counsel are unable to state in figures the amount of the loss therein referred to, and we are in no better position. Concerning the item numbered 5, whilst there are cases in which the fees of attorneys have been allowed for the obtention of a writ of injunction, we do not think they establish a precedent which should be here followed. For aught that appears, the result accomplished by the injunction might also have been accomplished by protest and notice served on defendant. Upon item 6 we are of opinion that plaintiff is entitled to recover the stumpage value of 180,000 feet of lumber at $4 per 1,000, or $720. The circumstances affecting that item are that defendant admits that it felled 221,000 feet of timber as having died by reason of its operations, and hauled it for shipment to plaintiff, and felled 6,000 or 7,000 feet which it did not haul, but as to that first mentioned it appears from the evidence that defendant did not comply with its contract by felling and hauling the timber “immediately” upon its death, or within such time as to enable plaintiff to make good lumber of it, and as to the other (which was left in the woods) the liability is admitted.
Defendant claims in reconvention two items, of $60,000 and $32,056, respectively, on the grounds that it entered into the contract sued on upon the representation that there were included therein 7,000 acres of long leaf pine, sufficient to enable it to make 40 crops (of 10,000 cups each), whereas, only 3,400 acres were delivered to it, from which but 20 crops could be made, and that it thereby lost $60,000 in profits which it would otherwise have made, and $32,056 in unnecessary expense incurred for the larger estimate.
The facts disclosed in that connection are that plaintiff was offered by another bidder the same rental per cup as was offered by defendant, and closed with defendant because it considered it the more responsible of the two; that defendant made its offer after its representatives had spent parts of two days in cruising over the forests; that they were informed by plaintiff’s president that he did not know how much long leaf pine there was, and that he referred them to one or two of his employes for such information as the latter possessed; that the employes gave them that information in good faith, and that defendant entered upon the lands and worked them for two years out of the three for which the lease was to run without complaint and without regard to whether particular tracts had been designated or not; that, when it was enjoined from further working, in violation of the lease, it abandoned the property; and, finally, that it is shown that there were included in the lease, and actually turpentined by the defendant, approximately 7,000 acres of long leaf pine — which facts dispose of the claims above mentioned, and also of the demand that plaintiff refund $2,211.-38 included in tire advance payment to it of $17,,500, on the ground that there was a shortage in the cups thus paid for; it having been through no fault of plaintiff that defendant abandoned the property and the contract.
*523 Included in the lease to defendant was a tract' of land which was occupied by one Crawford, who objected to defendant’s entry thereon, whereupon defendant, without notice of such intention, paid him $995.04 for that privilege, and it now seeks to recover that amount from plaintiff. But plaintiff shows that it had obtained a judgment against Crawford decreeing it to be the owner of the land, and that, on defendant’s demand to that effect, it would have had defendant put in possession by the sheriff.
Another claim is based on the fact that, after defendant had turpentined a certain 80-acre tract for two years, it paid the government of the United States $158.15 on that account. But plaintiff was given no notice of either the demand or the payment, and it is not here shown that the government was or that plaintiff was not the owner of the tract. To the contrary, plaintiff’s president says in his testimony:
“We have a chain of title that reaches- back a number of years. The Rapides Bank at one time owned that property; * * * has been handed down from party to party a number of times. We had it abstracted and our lawyers passed on it as- being good, and I bought and leased it in good faith.”
Hence we conclude that the demands in reconvention are without merit, and that the judgment appealed from should be amended by increasing the award in favor of plaintiff, and, as amended, affirmed.
It is therefore ordered and decreed that the judgment appealed from be amended by increasing the amount for which it was rendered from $8,552 to $10,943.40; that plaintiff recover legal interest upon said $8,552 from June 17, 1914, and upon the balance of said amount from the date at which this judgment shall become final; and that, as thus amended, said judgment be affirmed, at the cost of the defendant.
SOMMERVILLE, J., takes no part.