SAVOY, Judge.
Defendants appealed from an adverse judgment of the district court. Plaintiff answered the appeal asking for an increase in the award.
The district judge has analyzed the facts and the law applicable to the instant case and we adopt his opinion as our own as-follows :
“This is an action arising out of a con tract between plaintiff and defendants.. Plaintiff executed an oil, gas and mineral' lease to defendant, Pan American Petroleum Corporation, on December 10, 1958,. covering 14,806.57 acres of cutover swampland in Avoyelles Parish, Louisiana. Besides the usual stipulations in such leases, this clause was typed in and as part of the lease contract:
“ ‘Lessee shall be responsible for and agrees to make payment of all damage to lands, crops, timber and improvements caused by its operations hereunder.’
“Pursuant to its rights under the oil, gas and mineral lease, defendant, Pan American, proceeded to stake out locations to drill and did drill for oil, gas and minerals. The other defendant, Justiss-Mears Oil Company, a sub-lessee of Pan American, by unrecorded letter agreement, also proceeded to stake out locations to drill for oil and gas and did drill out several wells upon plaintiff’s land. The lessee and sub-lessee followed existing logging roads across the land leased, as far as practicable, and then proceeded to cut and clear roadways from the existing logging roads to the staked well locations. In addition, there was cleared, at each location, an area for the derrick, pipe platforms, mud pits, etc.; this suit was instituted as alleged damages to plaintiff occasioned by six different well locations, some of which were productive and some unproductive. Many other well locations were staked out and drilled — some productive and some not, after the filing of this suit. Plaintiff reserved its right to claim damages for these subsequent locations and access roads thereto. This case, therefore, is quite important and construction of the above clause is entitled to very careful consideration.
“As originally filed, the suit claims a total of $7,710.00, and the figure is based *155 upon $200.00 an acre, on the area cleared and used by defendants as aforesaid. It is alleged that there was a verbal accord on that figure between plaintiff’s agent and one of Pan American’s agents.
“Defendants filed an exception of vagueness — to the original petition asking for the board feet of timber destroyed; the number of acres damaged and in what manner; and the value of the timber destroyed on an acreage basis. Plaintiff then amended its petition setting forth its alleged damages in greater detail, and in so doing, increased its original demand to the sum of $10,355.92.
“Each defendant filed separate answers. Each denied, generally, the extent of the damages claimed by plaintiff; each conceded liability for actual compensatory damages under the special clause inserted in the lease. Each affirmatively alleged that the actual damages caused by its operations had been appraised by independent experts. Each admitted liability to the extent determined by the said experts. Each tendered into Court this determined •amount of damage, plus interest and accrued costs to date of tender. There was deposited and tendered the sum of $342.17 as the total liability of defendants, Justiss-Mears Oil Co., Inc., the sub-lessee, putting up that amount.
“The cause then came up for trial and quite a voluminous record was made up by testimony, exhibits and pictures.
“The issue to be determined by the Court is the amount of compensation to be paid to plaintiff for its damages under the special clause inserted in the lease, which is quoted above. The obligation of defendants arises out of contract. It is not an action in tort; there is no conversion or illegal trespass. Lessee had the right, under its oil and gas lease, to go upon the premises, to gain access to staked locations, and generally to do all that was necessary toward the realization of production of oil and gas.
'“The' acreages involved were substantially as follows:
“ROY O. MARTIN #1: Location-21^ Acres; roadway 1J4 Acres— Total 2.75 Acres
“ROY O. MARTIN #11: Location— 2}/£ Acres; roadway Acres — Total 3.25 Acres
“ROY O. MARTIN #111: Location —2Acres; roadway 14 Acre — Total
2.75 Acres
“ROY O. MARTIN #IV: Location - And - roadway - Total 4.9 Acres
“ROY O. MARTIN #V: Location-214 Acres; roadway 1Y2 Acres — Total 4.00 Acres
“ROY O. MARTIN #VI: Location— 2Y2 Acres; roadway lj4 Acres — Total 3.75 Acres
One unnecessary roadway, later abandoned, is also involved. The acreage is not given but $999.88 is claimed. (1 Acre allowed) .
“In asserting its damages, plaintiff claims the value of saw logs — 12" in diameter and larger; the value of the pulpwood — 4" to 12" in diameter; the costs of appraisals; loss of projected growth of the young timber; and costs to restore the surface as was in refilling mud and slush pits and deep ruts cut into the surface of the access roads. Defendants, on the other hand, challenge the quantum of saw logs and pulpwood; they challenge plaintiff’s right to recover for projected growth of young trees; and they challenge as ridiculous, the high charges to restore the surface of the land to an ‘as was’ state, since this is low swamp, without improved roads, subject to overflow and cut up ‘naturally’ with all types of lakes, bayous, streams, canals, and by man made logging roads. It is stated that the costs of restoring the surface to its former condition, at $150.00 to $200.00 per location, would in fact be *156 more than the land itself is worth, in fee and timber, exclusive of minerals; and the minerals would still be available to the owner, regardless of the surface condition.
“The Court repeats again — the legal issue is a simple one — How much is owed to the plaintiff as damage, by reason of the special clause in the oil lease above quoted. The Court must award a sum based upon a contractual covenant, not an award in tort, in breach of contract, or what is sometimes allowed in condemnation suits. It is an agreement between the parties; the Court must give effect to this agreement.
“Able counsel prepared exhaustive briefs for the Court. These were not too helpful on the question of damage. Most of the authorities cited were damages in tort cases, trespass, and condemnation proceedings, involving lands or right-of-way easements. Here we have a conventional agreement; the defendants had the right to do what they did, by the written accord of plaintiff, and that changes the relations of the parties considerably and makes the ‘yardstick’ for damages different from that in the cited cases.
“In that section of our Civil Code which deals with the effect of obligations and particularly Article 1934, we find this language :
‘Measure of damages — exceptions and modifications. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into contemplation of the parties at the time of the contract. * * * In the assessment of damages under this rule, as well as in cases of offenses and quasi offenses and quasi contracts, much discretion must be left to the judge or jury, * * *.’
This article covers other situations which the Court considers immaterial and irrelevant here. It does feel that the above quoted language is a guide for the Court.
“Article 1943 reads as follows:
‘The debtor is liable only to such damages as were foreseen, or might have been foreseen at the time of contracting, when it is not owing to his fraud that the obligation has not been executed’
“Articles 1945 and 1946 deal with the interpretation of agreements:
‘Courts are bound to give legal effect to all such contracts according to the true intent of all the parties; that the intent is to be determined by the words of the contract, when these are clear and explicit, and lead to no absurd consequences. * * * ’
‘The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules as to general and popular use.’
“The Court refers the reader to cases interpreting the above as follows:
1) D. M. Picton [& Co.] v. Eastes [5-Cir.], 160 Fed.2d 189;
2) Lee Lumber Co. v. Union Nava! Stores, 77 So. 131, 142 La. 502;
3) Illinois Central Railroad v. New Orleans Terminal Co., 78 So. 738, 143-La. 467;
4) McWilliams v. Harper [La.App.] 159' So. 454.
“The timber damage, in this case- and according to both sides, is the greatest element of damage. This is not spelled out too clearly in the agreement. Our Courts have held that when the word ‘timber’ is used in a grant or contract, without qualification or specification as to size, kinds, etc., it means such trees as are suitable for the manufacture of lumber for buildings or allied purposes in the particular area where- *157 situated. Lamptom Realty Co. v. Kerr, 154 La. 843, 98 So. 266; Bennett v. Bennett [La.App.], 14 So.2d 272; Cooley v. Meridian Lumber Co., 195 La. 631, 197 So. 255.
“In this particular area, the experts on both sides agreed that the timber measuring twelve (12") inches and larger, at a point four and one-half i^Vz) feet from the ground, was merchantible as saw logs. The timber measuring between four (4) and twelve (12) inches at that distance from the ground, could be marketed and sold as pulpwood. The remainder and smaller stuff, was not deemed merchantible and had only a speculative future value over a period of “X” years in the future. Plaintiff’s experts figured value at twenty-five (25) years hence. Then they backed up and discounted that value to a present value at the rate of four or six (4 or 6) per cent per annum.
“The Court cannot believe that the parties contemplated payments for anything but the merchantible timber at this time. The other is too speculative, complicated and conjectural for the Court to believe that the parties intended this strained and speculative interpretation. The last quoted decisions gives a good rule of construction which the Court is willing to accept.
“The value of a crop destroyed is the value at the time destroyed, and not what it would have been worth at maturity. Boudreaux v. Thibodeaux, 89 So. 250, 149 La. 400; Ingargiola v. Schnell [La.App.], 11 So.2d 281. The same can be said for a calf or like animal. The value of same at time destroyed is the compensatory damage for same — not what it would have been worth at maturity.
“Another element of damage claimed by plaintiff is the appraisal fees of its experts employed to estimate the timber damage. Our Courts have on many occasions held that these.are not recoverable as damages. They are expenses incurred in the preparation of a lawsuit. The Court can and should allow expert fees to those who appear and testify as experts — to be taxed as costs, but not to plaintiff as damages. Universal C.I.T. Corp. v. Jones [La. App.], 47 So.2d 359. See also, Ladner v. Aetna Casualty & Surety Company [La. App.], 139 So.2d 237.
“There would seem to be no more logic in awarding as damages, plaintiff’s experts’ fees than there would be to allow the fees of his attorney in the preparation and presenting of his suit. The attorney’s services would be just as important as the appraiser’s work, and the Courts have repeatedly held that the attorney’s fees are not recoverable as damages, unless there is a contract allowing such between the parties.
“Mr. Munsterman, one of plaintiff’s foresters, believed the average value of the timber on the lands in question would be $45.00 to $50.00 per acre. On cross-examination, however, he admitted that he would not pay this sum for this type land, with the timber thereon.
“Mr. Jerome Summers, another forester of plaintiff, arrived at a timber value on these lands averaging $89.00 per acre. He too admitted that he would not be interested in purchasing such lands with the timber at that figure. Another of plaintiff’s witnesses admitted that most of these lands were purchased by plaintiff about ten (10) years ago at a price of about $20.00 to $25.00 per acre. And he further stated that he would not recommend buying such lands by plaintiff, even now, at more than twenty five $25.00) dollars per acre.
“Defendants’ expert forester testified that he counted the trees or timber actually destroyed, the size and kind, and arrived at a total value of $343.00, or about $15.00 per acre timber damage. In contrast, the other experts (on plaintiff’s side) had made their estimates by counting the standing timber on a five (5) chain wide strip along two sides of the cleared area and used that as a yardstick to figure the loss on the area cleared. Both methods are apparently acceptable. The Court believes that plaintiff’s witnesses are probably on the high side of *158 actual value, while defendant’s expert is probably on the low side.
“Damage to lands is to be next considered. Plaintiff urges that the Court should allow as damages to the land, what it would cost plaintiff to restore the surface to its condition prior to oil and gas exploration. In other words, bulldozer time and rates to refill all ruts, slush pits, mud pits, trenches, etc., regardless of whether it would be economically expedient to do so or not. Roughly, the sum of $100.00 per acre is claimed for this damage. Again, the Court cannot believe that the parties intended such reparation to be done when the contract was entered into; certainly not as to the low timber lands. It can see why this would be contemplated in open land subject to cultivation. There would then be a reason to restore the surface to its former status. Here, we have low lands, subject to periodic overflows, which are already cut up by bayous, streams, lakes, water 'bottoms and logging roads. In wet weather, the terrain is generally inaccessible to commercial vehicles; it takes j eeps, caterpillars, bulldozers and helicopters to reach the locations. It is hard for the Court to believe, if $100.00 per acre were allowed for this element of damage, that plaintiff would spend that amount of money to level off the ‘cut up’ areas. Even where ■such ruts might be as much as three (3) feet deep, likened unto canals, it would be more appropriate and practical to consider ■same as small streams, and fill in suitable crossings only, where desired, or to seek new alternate routes for logging rather than the oil well access roads. Too, it must be remembered, that defendant’s operations, hauling materials, etc., will be a continuing 'necessity, with heavy equipment, for many years. To restore and next year again cut up the same access road, with the possibility of doing this over and over, would seem vain and useless to the Court. And to force defendants to pay, with no restoration planned in view of the expected recurrent nature of its operations in the future, would seem contra to basic justice.
“The parties certainly knew at the time the contract was entered into, what operations were contemplated by defendants. They knew heavy equipment, heavy vehicles, etc., would have to reach the drill sites. Damages were no doubt contemplated and expected. But to say that a restoration of the surface, as it was, regardless of costs, in an area of this type, was what the parties intended, the Court cannot believe.
“There would seem to be no more logic or basis for a complete refill and levelling off of the access roads, from beginning to end, in that area, than there would be to fill and level off the hundreds of natural bayous, streams, ravines, lakes, etc., which criss-cross that whole area; these are much more formidable natural barriers which divide and sever the land; even if the access roads were like canals, for the purpose of argument, it would not be feasible or practical to refill and level off same, any more so than the existing natural barriers. Damaging? Yes. But to the extent as is necessary to cross same by ‘fill up’ spots or bridging, and not for a complete restoration of the surface to its former condition.
“The Court believes that the sum of $35.00 per acre for timber damages would do substantial justice. It believes that $15.00 per acre to provide spot fills and crossings of the access roads, would be adequate compensation to plaintiff for the surface land or severance damages. The other damages claimed will be denied. This allows to plaintiff, a told figure well in excess of what it would pay for the purchase of similar lands, with the timber thereon. And, of course, the oil being produced under the lease and to be produced, will make these values rather inconsequential to both sides.
“LET THERE BE JUDGMENT HEREIN in favor of plaintiff and against Pan American Petroleum Corporation, for the product of $50.00 multiplied by the total number of acres as determined by the Court *159 hereinabove, or $1,170.00, together with legal interest from date of judicial demand until paid and for all costs. The fees of the experts who testified as such herein, to be fixed at $75.00 per day each, and taxed as costs.”
For the reasons assigned the judgment of the district court is affirmed at appellants’ costs.
Affirmed.