The judgment appealed from is therefore affirmed.

---

(115 So. 447)

No. 28466.

## MOULIN v. MONTELEONE.

Nov. 28, 1927. Rehearing Denied Jan. 18, 1928.

*(Syllabus by Editorial Staff.)*

1. **Husband and wife ⬥324—Damages for alienation of wife's affections, being punitive or exemplary, cannot be recovered.**

Action for damages for alienation of wife's affections will not lie in Louisiana, since such damages, for the most part, are essentially punitive or exemplary damages, which are not authorized in civil cases in such state.

2. **Husband and wife ⬥324—Where public wrong causes private injury as in case of alienating wife's affections, public wrong is dealt with alone in criminal courts and private wrong in civil courts.**

Where public wrong causes personal or private injury to individual, one wrong is not confused with or swallowed up in the other under Louisiana procedure, but public wrong is dealt with alone in courts exercising criminal jurisdiction and private wrong in courts exercising civil jurisdiction, so that prosecution and punishment for alienating wife's affections cannot be by means of civil suit for benefit only of the other party to contract.

3. **Husband and wife ⬥324—No damages are recoverable for alienating wife's affections, since act is mere inducement to violate civil contract with third person (Rev. Civ. Code, art. 86).**

Action for damages for alienation of wife's affections will not lie in Louisiana, since marriage is civil contract, under Rev. Civ. Code, art. 86, and there is no right of action for damages ex delicto against one who induces another to violate his or her contract with third person.

4. **Husband and wife ⬥55—In Louisiana, wife has every prerogative that husband has.**

In Louisiana, wife by virtue of emancipation laws has practically every prerogative that husband has.

5. **Husband and wife ⬥324—Damages cannot be recovered for loss of affections of human being.**

Action for damages for alienation of wife's affections will not lie in Louisiana, since under civil law, in absence of statute, there is no right of action for loss of services, support, companionship, or affections of human being, enjoyment of which is not property right.

6. **Husband and wife ⬥324—Statute providing that one causing damage must repair it does not authorize action for alienation of wife's affections (Civ. Code, art. 2315, as amended by Act No. 71 of 1884; Act No. 120 of 1908; Act No. 159, of 1918).**

Action for damages for alienation of wife's affections is not permitted, under Civ. Code, art. 2315, as amended by Act No. 71 of 1884, Act No. 120 of 1908, and Act No. 159 of 1918, providing that every act causing damage obligates person at fault to repair it.

7. **Courts ⬥92—Decision of court of last resort is authority only for what court decides, not obiter dictum.**

Decision of court of last resort is authority only for what court decides, and not for obiter dictum in opinion.

**8. Husband and wife ☞324—Statute providing that one causing another to do unlawful act is answerable in solido with such person, for damage caused does not authorize action for alienation of wife's affections (Civ. Code art. 2324).**

Action for alienation of wife's affections is not authorized by Civ. Code, art. 2324, providing that one causing, assisting, or encouraging another to do unlawful act is answerable in solido for damage caused, since, as wife is not answerable in damages for offense, defendant could not be answerable in solido with her.

**9. Husband and wife ☞324—According to natural law and reason and received usages, no action lies for alienation of wife's affections.**

Husband *held* to have no right of action for alienation of his wife's affections under natural law and reason and received usages, which may be basis of decision when there is no positive law giving right of action.

Land and Brunot, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Action by Augustin R. Moulin against Frank J. Monteleone. From the judgment dismissing the suit on an exception of no cause or right of action, plaintiff appeals. Affirmed.

Brittingham & Tycer, of New Orleans, for appellant.

McCaleb & McCaleb, of New Orleans, for appellee.

O'NIELL, C. J. This is a suit for damages for alienation of a wife's affections. It is said to be the first instance where such a cause or right of action has ever been asserted in Louisiana. The suit was dismissed on an exception of no cause or right of action, and the plaintiff has appealed from the decision.

There is no positive law to be found on the subject, in the Civil Code, or in any statute or in the jurisprudence of this state. There is no suggestion or intimation of such a right of action to be found anywhere in the provisions of the Civil Code on the subject of marriage, or of the relative rights and obligations of husband and wife, or the dissolution of the contract of marriage, or the causes or the consequences thereof, or on the subject of damages, arising either ex delicto or ex contractu. Articles 119 and 120 of the Code declare that the husband and wife owe to each other fidelity, support and assistance; that the wife must live with her husband and follow him wherever he chooses to reside; and that he, in turn, must provide for her wants according to his means. It seems strange that the law, in saying what the husband and wife owe to each other, does not mention love and affection; perhaps it is because the law undertakes only to control and regulate human conduct—not human nature. As Ralph Waldo Emerson observed, laws do not make men; men make laws.

[1] There are several very obvious reasons why none of the great lawyers who have graced Louisiana's bar has ever heretofore thought that an action for damages for alienation of a wife's affections would be consonant with the system of law peculiar to Louisiana. In the first place, the damages which are allowed in those jurisdictions where the offense constitutes a cause of action for damages are declared to be—and they are essentially—punitive or exemplary damages. And, as this court has said many times, "Our law does not authorize the infliction of punitive damages in civil cases." Serio v. American Brewing Co., 141 La. 291, 74 So. 998, L. R. A. 1917E, 516; Vincent v. Morgan's La. & T. R. R. & S. S. Co., 140 La. 1027, 74 So. 541; Burt v. Shreveport Railway Co., 142 La. 308, 76 So. 723; Lee Lumber Co. v. Union Naval Stores Co., 142 La. 521, 77 So. 131; Dunson v. Baker, 144 La. 167, 80 So. 238; Howell v. Vicksburg, S. & P. Ry. Co., 144 La. 428, 80 So. 613; Hanna v. Otis, 151 La. 851, 92 So. 360; Selser v. Revol, 152 La. 454, 93 So. 675; Janssen Catering Co. v. Abadie, 157 La. 357, 102 So. 428; Mundy v. Phillips, 157 La. 445, 102

So. 519; Spearman v. Toye Bros. Taxicab Co. (No. 28141, 164 La. 677, 114 So. 591.

[2] The idea of allowing punitive damages, in a civil action for tort, is perhaps a relic of the obsolete remedy called "appeal," which Blackstone, vol. 4, p. 383, says "was an accusation by a private subject against another for some heinous crime, demanding punishment on account of the particular injury suffered, rather than for the offense against the public." "It had its origin," says the author, "in those times when a private pecuniary satisfaction called a weregild was constantly paid to the party injured, or his relations, to expiate enormous offenses." *Weregild* meant the money value of a human being. The remedy called "appeal," in the early periods of the common law, was discouraged and virtually abolished by a statute of Westminster II, 13 Edward I, c. 12, requiring that, if the appellee should be acquitted, the appellant should suffer a year's imprisonment and pay a fine to the king, besides damages to the appellee, etc. 4 Blackstone, 316. In Louisiana, if a public wrong causes personal or private injury to an individual, the one wrong is not confused with or swallowed up in the other, but the public wrong is dealt with alone in the courts exercising criminal jurisdiction, and the private wrong in the courts exercising civil jurisdiction.

The case of Massy v. The Marquis of Headfort, in County Clare, Ireland, in 1804, for damages for alienation of a wife's affections, is one of the most memorable in Anglo-Saxon annuls. It was made so, not so much by the prominence of the parties, as by the greatness of Curran's speech to the jury, and by the tragic background for it, in that Curran had only recently lost his own wife in the same terrible way. Although he represented the plaintiff in the case, and spoke for damages, and personified his client's cause in his own life, he gave utterance, perhaps unconsciously, but in a way almost gigantic, to the fundamental proposition that compensation in money is not the right remedy for loss of a wife's affections. Turning from the jury to the presiding judge, Curran said:

"Oh, what woe would have been saved if you. my Lord, had met the adulterer when he arrived at the bank of the river with the ill-fated fugitive, and had spoken to him thus: 'Pause, my Lord, while there is yet a moment for reflection. What are your motives, what your views, what your prospects, from what you are about to do? You cannot look to the chance of marrying this wretched fugitive. Between you and such an event there are two sepulchers to pass. [The Marquis of Headfort had a wife, and Mrs. Massy, of course, had a husband.] What are your inducements? Is it love, think you? No. Do not give that name to any attraction you can find in the faded refuse of a violated bed. Love is a noble and generous passion; it can be founded only on a pure and ardent friendship, on an exalted respect, on an implicit confidence in its object. Could you repose upon her faith? Look in her face, my Lord; she is at this moment giving you the violation of the most sacred of human obligations as the pledge of her fidelity. She is giving you the most irrefragable proof that as she is deserting her husband for you, so would she without scruple abandon you for another.' "

The damages sought by the Reverend Charles Massy from The Marquis of Headfort were not compensatory, but punitive or exemplary, damages. That was acknowledged in the speeches by all of the great array of counsel who appeared, and was repeated in Baron Smith's charge to the jury, when he said:

"The principle is that this sort of action partakes of the nature of a penal prosecution, and that large and exemplary damages are usually awarded."

[3] Another reason why, in Louisiana, a suit of this kind is untenable is that, as to the rights of the parties:

"The law considers marriage in no other view than as a civil contract." Rev. Civ. Code, art. 86.

And it is well settled, in Louisiana, that there is no right of action for damages ex de-

licto against one who induces another to violate his or her contract with a third person. See Kline v. Eubanks, 109 La. 241, 33 So. 211, and B. J. Wolf & Sons v. New Orleans Tailormade Pants Co., 113 La. 388, 37 So. 2, 67 L. R. A. 65, quoting Cooley on Torts (2d Ed.) p. 581, viz.:

"An action cannot, in general, be maintained for inducing a third person to break his contract with the plaintiff; the consequence, after all, being a broken contract, for which the party to the contract may have his remedy by suing on it. But if the third person was induced to break his contract by deception, it may be different. If, for example, one were to personate a vendee of goods, and receive and pay for them as on a sale to himself, the vendee would have his action against the vendor, but he might also pursue the party who, by deceiving one, had defrauded both."

There is no element of such deception or fraud when a man persuades the wife of another to breach her contract by violating her marriage vow. It is culpable, of course, beyond measure, and ought to be subject to severe penalty; but that has nothing to do with the personal right of action of the party injured by the breach of contract. It is true that marriage is something more than an ordinary contract in which the parties alone are concerned, for it is a status, in which society itself is concerned. But the laws which govern marriage as a status, in the interest of society, are those which protect society generally, such as penal laws, as distinguished from those which protect and regulate the private rights of the parties to the contract. One who induces another to break that contract ought to be subject to prosecution at the instance and for the benefit of society, but the prosecution and punishment cannot be by means of a civil suit, for the benefit only of the other party to the contract.

In each of the two cases last cited, the action was for damages against a person who had persuaded another to breach his contract of employment with the plaintiff, and the damages claimed were the loss of the services to be rendered. The decisions are therefore very apropos. In the latter of the two cases (113 La. 394 and 396, 37 So. 5) the court said:

"In Kline v. Eubanks, 109 La. 242, 33 So. 211, we held that the civil action provided by that statute [Act 50 of 1892, p. 71] would not lie until after a criminal conviction. We also considered the case under Civ. Code, art. 2315, which provides that 'every act of man that causes damage to another obliges him by whose fault it happened to repair it'; and we held that no action was maintainable under said article where a third person had knowingly employed and enticed away a laborer before the expiration of the term of his contract. * * *

"While the Mosaic law, cited by counsel, declares that 'thou shalt not covet thy neighbor's servant,' it does not impose a pecuniary penalty for disobedience. It may also be noted that in the time of Moses servants were slaves, and were classed with the ox and the ass."

And so, also, was classed the neighbor's wife, in the Mosaic law:

"Thou shalt not covet thy neighbor's house; thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is thy neighbor's."

At common law, the right of action for damages for alienation of a wife's affections is in some measure based upon the same obsolete idea that the wife is one of the husband's chattels, and that her companionship, her services and her affections are his property, for the loss of which, by wrongful inducement on the part of another man, the husband ought to be compensated with money. 3 Blackstone, p. 143, explains that that is why, at common law, the wife has no such right of action for alienation of the affections of her husband, viz.:

"The inferior hath no kind of property in the company, care or assistance of the superior, as the superior is held to have in those of the inferior; therefore the inferior can suffer no loss or injury."

[4] It is just as true that a man can have no kind of property in the company, care or assistance of one who is, in every sense, his

equal in the eyes of the law. It is not the wife's inferiority, but her want of superiority, that denies her the right of action, accorded the husband at common law, to recover damages for alienation of the affections of the other spouse. In Louisiana, the wife, by virtue of several recent emancipation laws, has practically every prerogative that the husband has. It would be absurd, therefore, to give to husbands the right of action for damages for alienation of the wife's affections, on the theory of the common law that she is his inferior, or to give the right of action to husbands and withhold it from their wives. In fact, and in the very nature of things, it would be far better to give the wife a right of action for damages for the loss of the protection and support of her husband than to give him a right of action for damages for the loss of her love and affection. It was on that theory, of the husband's being of more financial value and importance to the wife than she is to him, that the Legislature, in amending article 2315 of the Civil Code so as to give the wife and children a right of action for damages for the loss of the services and support and companionship and affections of the husband and father, withheld such a right of action from the husband for the loss of the services or support or companionship or affections of the wife, until the adoption of the Act 159 of 1918, which was enacted pursuant to the ruling in Flash v. Louisana Western Railroad Co., 137 La. 352, 68 So. 636, L. R. A. 1916E, 112. See Act 223 of 1855; Act 71 of 1884; Act 120 of 1908; and Kerner v. Trans-Mississippi Terminal Railroad Co., 158 La. 853, 104 So. 740.

In 1 Cooley on Torts (3d Ed.) c. 8, entitled "Injuries to Family Rights"—the same chapter that deals with the common-law right of action for damages for alienation of a wife's affections—on page 465, the author says:

"If we direct attention to the remedies which, at common law, the husband might have against third persons for a violation of his rights as husband, we find them all grounded upon or permeated with the ideas which mark their origin in a rough and uncultivated society."

In the same chapter and section, on the next preceding page, 464, the author speaks of that period when the common law on this subject was forming, as:

"When serfdom and villenage very largely prevailed and when wife and children were to husband and father rather servants and dependents than equals, and were expected to look to him for protection against wrongs at the hands of others. * * * Social changes have been going on more rapidly in modern times than the modification of legal principles, and the common law of family rights is, in most particulars, not greatly different now from what it was when it tolerated a man in inflicting personal chastisement on his wife or his marriageable daughter."

[5] Another reason why, in Louisiana, the husband has no right of action for damages for alienation of his wife's affections is that, under the civil law, in the absence of a statute conferring such right, there is no right of action for damages for the loss of the services or support or companionship or affections of a human being. The fundamental reason for that is that the enjoyment of the services or support or companionship or affections of a person is not a property right, except where it is made such by statute. Paraphrasing 3 Blackstone, p. 143, the husband has no kind of property in the companionship, services or affections of the wife "as the superior is held to have in those of the inferior" at common law.

[6] It is argued for the appellant that he has a right of action under the broad statement in article 2315 of the Civil Code that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. It is well settled, however, that that broad language, which first appeared as article 16 of title 4, Book 3, of the Act of March 31, 1808, called the "Di-

gest of the Civil Laws in Force in the Territory," and sometimes called the Civil Code of 1808, was only declaratory of a very general and fundamental principle of justice, and was not intended to give a cause or right of action for every grievance, or where none was allowed otherwise under the laws in force in the territory. The same principle which was declared in article 16 of title 4 of Book 3 of the Digest of 1808 had been stated as law 6 in the fifteenth title of the seventh Partidas, viz. "That he who causes damage to another, by his fault, is bound to make reparation therefor," and it was a part of the Roman law. But, under those laws, which were in force when the Digest of 1808 was adopted, there was no right of action for damages for the loss of the services or support or companionship or affections of a free person caused by the wrongful act of another. It is certain that, under the Roman and Spanish laws, there was no right of action for alienation of a wife's affections. If a man attempted to seduce or corrupt the morals of a woman, either married or single, he was answerable in damages for the offense to her, but to no one else no matter how the offense might have injured also her "father, husband, father-in-law, or other relations." It was virtually so stated in the seventh Partida, tit. IX, law 5 (Moreau & Carleton's Edition) vol. II, p. 1176, viz.:

"Men sometimes offend, dishonour and harass, by various means, married or unmarried women, or widows who lead virtuous lives at home and enjoy good characters, by endeavoring frequently to speak with them, either in the houses where they dwell, or by following them in the streets, churches or other places where they are to be found; or by secretly sending jewels to them and those with whom they live, in order to corrupt them both; at other times by endeavoring to corrupt them, by means of pimps, and in various other ways, so that by great importunity and artifice, there are some women who are finally seduced. And even good women who resist their attempts are, in a manner, injured in their character, inasmuch as they will be suspected of committing some evil with those who pursue them so assiduously, in either of the ways above mentioned. Wherefore we consider that they who conduct themselves in this manner do great wrong and injury to such women, as well as their fathers, husbands, fathers in law, and other relations. We therefore ordain that every man who shall offend in either of the ways herein mentioned *shall make amends to the woman who sustains injury thereby.*" (The italics are ours.)

In the Digest of 1808, the article (16, of Book 3, tit. 4) which is now article 2315 of the Civil Code was written thus:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it, even though the fault be not of the nature of those which expose to the penalties of simple or correctional police."

When the article was copied into the Code of 1825 as article 2294, it was abbreviated thus:

"Every act whatever of man, that causes damage to another, obliges him, by whose fault it happened, to repair it."

That is an exact translation of article 1382 of the Code Napoleon.

The first case in which damages were claimed, under article 2294 of the Code of 1825 (now article 2315 of the Revised Civil Code), for the loss of the support and companionship and affection of a person, caused by the wrongful act of another, was that of the widow Hubgh v. New Orleans & Carrollton Railroad Co., 6 La. Ann. 495, in 1851. The widow, for herself and for her minor children, claimed damages for the loss of the support and companionship and affection of her husband—her children's father—who was killed through the alleged negligence of the defendant. She did not claim that a right of action for the personal injuries which her husband had suffered had survived in her favor or in favor of her children. There was therefore no issue or question of survival or heritability of a right of action for personal injuries. The only question was whether the plain-

tiff had a right of action for damages against the party whose fault had caused her and her children the loss of the support and companionship and affection of her husband. The court ruled that she had no right of action because, although the case was within the very letter of the law, it was not within its meaning or its spirit. The court observed that article 2294 of the Code of 1825 was not new legislation, even in the Digest of 1808, but was merely a restatement of a fundamental principle which was theretofore embodied in the laws of Rome and Spain, and that it was therefore subject to the same construction and limitations which had been put upon it in the jurisprudence of Rome and Spain. The court said:

"The dispositions of article 2294 are found in the Roman and Spanish laws; so far from being new legislation, that article embodies a general principle as old as the science of jurisprudence itself, and it must still be understood, with the limitations affixed to it by the jurisprudence of Rome and Spain."

In an application for rehearing, in the Hubgh Case, it was argued at length and with great force, on behalf of the plaintiff, that, inasmuch as the French commentators and the Court of Cassation had maintained that, under the French Code, there was a right of action for the loss of the services, support, companionship and affections of a person, by the fault of another, this court should give the same construction to article 2294 of the Code of 1825. But the court, through Chief Justice Eustis, replied that the interpretation which the French commentators and the Court of Cassation had given to article 1382 of the French Code was according to the jurisprudence prevailing in France when the article was adopted; whereas, under the jurisprudence of Rome and Spain, which was controlling in Louisiana when the article was adopted in the Digest of 1808, there was no right of action for the loss, by the wrongful act of another, of the services

or support or companionship of a free person. The court therefore refused a rehearing, saying:

"It is understood that the present action is founded upon the direct injury to themselves by the death of Hubgh, from the causes alleged in the petition; and is not attempted to be maintained as a right transmitted to them through the deceased. The right of action is claimed on the ground on which it has been allowed in France; the articles of the Codes of that country and of Louisiana being identical, which provide that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. Code Napoleon, 1382; L. C. 2294. * * *

"We found no precedent for any such action, though, unfortunately, occasions for its exercise have been but too frequent within our borders; and with the learning and research which has distinguished our bar for nearly half a century, the singular fact remains unexplained, that up to the present suit no such right of action has been asserted. There can have been but one cause for this; and that is, the universal conviction of the bench and the bar that no such action could be maintained. * * *

"The obligation resulting from a tort can only be the ground of an action, when the obligation is recognized and ratified by the law; for by far the greater portion of the wrongs to which we are exposed in our artificial condition of society the law does not afford any redress. The redress is of necessity confined to legal rights, for which the law has provided an action or inflicts a punishment. 3 Black. Com. 23, 117; Pothier on Obligations, No. 1 and 197.

"We now come to consider whether the plaintiff's right of action is authorized by the articles of our Code. The article 2294 of our Code provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. The provisions of this article, however general and comprehensive its terms may be, are found more than once recited in terms equally general and comprehensive in the laws of the fifteenth title of the seventh Partida. The article was inserted in the Code of 1809, at a time when the Spanish laws were in force. *It was put and retained to this time in the Code, not for the purpose of making any change in the law, but because it was a principle which was in its proper place in a Code; a principle which would be equally recognized as a necessary conservative element of society, and equally obligatory whether it was formally enacted in a Code or not.* [The italics are ours.] * * *

"Conceding it to be true, that the present jurisprudence [in France] is as stated by counsel, and that the decisions of the Court of Cassation, on this article, are correct—a proposition which we have no interest in questioning —does it follow that our decisions ought to be the same on the article in our Code, which is identical? We think not; and for this reason, that the systems to which the articles apply are not similar. * * *

"In the case, therefore, under consideration, the law being different in Louisiana from that of France, as the latter is assumed to be, in argument, and the application of the article being to the law of Louisiana, and not to that of France, the import and sense of the article becomes entirely an open question; and the responsibility of determining its application is thrown upon the court without the aid of any authority, and unrestricted by any interpretation. * * *

"Finding that no such action was ever instituted in this state, our inquiries were necessarily directed to the examination of the former *jurisprudence of Louisiana*, in order to ascertain whether the action could be based on any *well-recognized principle in the Roman or the Spanish laws*. [The italics are ours.]"

In speaking of "the former jurisprudence of Louisiana," under the "well-recognized principles in the Roman and Spanish laws," the learned Chief Justice, of course, did not have reference to any of the statute laws of Rome or Spain, for they were repealed by article 3521 of the Code of 1825, and by section 25 of Act 83 of 1828. The court had already decided, in Reynolds v. Swain, 13 La. 198, that it was only the "positive, written or statute laws" of Spain, Rome and France that were repealed by article 3521 of the Code of 1825, and the act of 1828, and not "those principles of law which had been established or settled by the decisions of courts of justice." In the case last cited, Mr. Justice Martin said:

"We, therefore, conclude that the Spanish, Roman, and French civil laws which the Legislature repealed are the positive, written, or statute laws of those nations, and of this state; and only such as were introductory of a new rule, and not those which were merely declaratory—that the Legislature did not intend to abrogate those principles of law which had been established or settled by the decisions of courts of justice."

It is certain, therefore, that, under "those principles of law which had been established or settled by the decisions of the courts of justice" in Louisiana, before the adoption of the Code of 1825, there was no right of action for damages for the loss of a wife's affections through the wrongful attentions of a third party. We are not aware of any principle in the laws of Rome or Spain prevailing here when the Code was adopted that would have sanctioned such a suit. It would have been utterly inconsistent with the doctrine recognized in the Hubgh Case, that there was no right of action for damages for the loss of the companionship or affections of a husband, or wife, or of any other relation, by the fault of a third party.

Four years after the Hubgh Case was decided, the Legislature amended article 2294 of the Code of 1825, by the Act 223 of 1855, by declaring that a right of action for personal injuries should survive, in case of the death of the person injured, for one year, in favor of his minor children and widow, or either of them, and in default of them in favor of the surviving father and mother, or either of them. The amendment did not give the widow or minor children or father or mother a right of action for damages suffered directly by them, in the loss of the support or companionship of the deceased, but merely gave them the right to assert, within one year, such right of action as the deceased had for the suffering endured by him. In the case of Herman, Widow and Tutrix, v. N. O. & C. R. R. Co., 11 La. Ann. 5, where the widow sued for damages for herself and her child for the loss of support of the husband and father, the court declined to decide what effect the amendment by the Act 223 of 1855 had had upon article 2294, because the acci-

dent complained of had occurred before the statute went into effect.

As amended, article 2294 was retained as article 2315 in the revision of the Code of 1870. The first case in which the article, as amended, was construed was Earhart v. N. O. & C. R. R. Co., 17 La. Ann. 243, in 1865. The suit was for damages for grief suffered by the plaintiff in consequence of the death of his minor child, killed by a railroad train. The ruling was that the article of the Code, as amended, merely subrogated the parent to the right of action which the child had had for the suffering endured by him. As the only damages claimed were those alleged to have been suffered directly by the father, in the loss of the companionship of the child, the court maintained the exception of no cause or right of action, reversed the verdict of the jury, and dismissed the suit. The next case was McCubbin, Tutor, v. Hastings, 27 La. Ann. 713, in 1875. It was held that the plaintiff had not proven that any damages were suffered by him personally, and that his minor child could recover only such damages as the injured mother had suffered, and not the damages suffered directly by the child by the loss of the mother's care, etc. The next case was that of Vredenburg v. Behan, 33 La. Ann. 627, in 1881; and the ruling was that the district judge had erred in charging the jury "that damages can be claimed by the heirs of the deceased for the loss of his life." The court said:

"The act of 1855, amending article 2315 of the Civil Code, expressly limits such right [of action] in favor of the widow and minor heirs to the right of action which the deceased would have had, had he survived the injury, and it cannot be extended beyond this."

In Walton v. Booth, 34 La. Ann. 913, the plaintiffs sued for damages for the injury and consequent death of their married daughter. They claimed damages only for the suffering which the deceased had en-

dured, and for which she might have sued if she had survived. The defendant pleaded that, if there was a right of action in any one for the death of the woman, it was vested in her husband; but the court ruled, according to the statute, that the right of action was in the surviving parents of the injured woman, and that the husband had no right of action.

Thereafter, by the Act 71 of 1884, the Legislature amended article 2315 of the Code so as to give to the surviving relations, named in the article, a right of action for the loss of the support and companionship of the deceased, in addition to their right to recover such damages as he might have recovered if he had survived. The amendment consisted of the addition of this paragraph, viz.:

"The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child, or husband or wife, as the case may be."

In Van Amburg v. V., S. & P. Ry. Co., 37 La. Ann. 650, 55 Am. Rep. 517, in 1885, the plaintiff claimed damages for the loss of support and companionship and affection of her son, who was killed on the defendant's railroad, and claimed damages also for the suffering which he had endured, and for which he might have claimed damages if he had survived. The court allowed the latter claim, but rejected the former, because the accident had occurred a few days before the Act 71 of 1884 went into effect.

In Chivers v. Roger, 50 La. Ann. 57, 23 So. 100, in 1898, the plaintiff sued for damages for the death of his son, and died after the case had been tried and submitted for decision but before it was decided. His heirs—not the minor child or children or widow or father or mother of the injured person, but the heirs at law of his father—intervened and became parties plaintiff in the case. It was held that the right of ac-

tion had abated at the death of the father of the injured person, because the right to claim damages for the death of a human being—or for the loss of his companionship, support, services or affection—was not transmissible, either by the terms of the statute or by the law of inheritance.

Huberwald v. Orleans R. R. Co., 50 La. Ann. 477, 23 So. 474; Delisle v. Bourriague, 105 La. 77, 29 So. 731, 54 L. R. A. 420; Walker v. V., S. & P. Ry. Co., 110 La. 718, 34 So. 749; Payne v. Georgetown Lumber Co., 117 La. 983, 42 So. 475; Lynch v. Knoop, 118 La. 611, 43 So. 252, 8 L. R. A. (N. S.) 480, 118 Am. St. Rep. 391, 10 Ann. Cas. 807; Landry v. American Creosote Works, 119 La. 231, 43 So. 1016, 11 L. R. A. (N. S.) 387; Vaughan v. Dalton-Lard Lumber Co., 119 La. 61, 43 So. 926; Flash v. Louisiana Western R. Co., 137 La. 352, 68 So. 636; L. R. A. 1916E, 112; and Kerner v. Trans-Mississippi Terminal R. Co., 158 La. 853, 104 So. 740—are further examples of the strictness with which this court has adhered to the rule established in the case of Hubgh v. New Orleans & Carrollton R. Co., that there is no right of action for damages for the loss of the companionship, services, support or for actions of a human being, except in so far as the amendments of article 2315 of the Civil Code, by Act 71 of 1884, the Act 120 of 1908, and the Act 159 of 1918, have expressly granted the right to the relations therein enumerated. and under the conditions therein stipulated.

There are many other instances in our jurisprudence where a wrongful act which caused damage to another did not oblige the wrongdoer to repair it; because the case, although within the letter of the law, was not within its spirit. In Wooten v. Geisser, 9 La. Ann. 523, for example, the plaintiff claimed $10,000 damages, averring that:

The defendant, "contriving, and wrongfully and unjustly intending to injure him, had debauched a young woman who stood in the rela-

tion of daughter and servant to him, by means whereof he lost her services, and was put to great expense."

The suit was dismissed for want of a cause or right of action, on the ground, as the court said:

"It is not alleged that either violence or craft was employed by the defendant, and we are left to infer that the woman was as guilty as himself."

In Pattison v. Gulf Bag Co., 116 La. 963, 41 So. 224, 114 Am. St. Rep. 570, where the plaintiff claimed damages because he had suffered humiliation, etc., by the publication of a libel against his minor daughter, the court held that, notwithstanding the case came within the letter, it was not within the spirit of article 2315 of the Code, and that the plaintiff had no right of action. In Sperier v. Ott, 116 La. 1087, 41 So. 323, 7 L. R. A. (N. S.) 518, 114 Am. St. Rep. 587, the court held that the parents had no right of action for damages for a mental shock and distress caused by an unlawful and malicious arrest and prosecution of their two minor children. The case was within the letter of the Code, but without its spirit. The United States Supreme Court reports are full of cases that were within the letter but not within the spirit of the law. The most interesting review and discussion of the cases is in Hawaii v. Mankichi, 190 U. S. 212, 23 S. Ct. 788, 47 L. Ed. 1020, viz.:

"But there is another question underlying this and all other rules for the interpretation of statutes, and that is, What was the intention of the legislative body? Without going back to the famous case of the drawing of blood in the streets of Bologna, the books are full of authorities to the effect that the intention of the lawmaking power will prevail, even against the letter of the statute; or, as tersely expressed by Mr. Justice Swayne, in Smythe v. Fiske, 23 Wall. 374, 380, 23 L. Ed. 47, 49: 'A thing may be within the letter of a statute and not within its meaning, and within its meaning, though not within its letter. The intention of the lawmaker is the law.' A parallel expression

is found in the opinion of Mr. Chief Justice Thompson of the Supreme Court of the state of New York (subsequently, Mr. Justice Thompson of this court), in People v. Utica Ins. Co., 15 Johns. 358, 381, 8 Am. Dec. 243: 'A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute, unless it be within the intention of the makers.'

"Without going farther, numerous illustrations of this maxim are found in the reports of our own court. Nowhere is the doctrine more broadly stated than in United States v. Kirby, 7 Wall. 482, 19 L. Ed. 278, in which an act of Congress, providing that if 'any person shall knowingly and willfully obstruct or retard the passage of the mail, or of any driver or carrier,' was held not to apply to a state officer who held a warrant of arrest against a carrier for murder, the court observing that no officer of the United States was placed by his position above responsibility to the legal tribunals of the country, and to the ordinary processes for his arrest and detention when accused of felony. 'All laws,' said the court, 'should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' A case was cited from Plowden, holding that a statute which punished a prisoner as a felon who broke prison did not extend to a prisoner who broke out when the prison was on fire, 'for he is not to be hanged because he would not stay to be burned.' Similar language to that in Kirby's Case was used in Carlisle v. United States, 16 Wall. 147, 153, 21 L. Ed. 426, 429.

"In Atkins v. Fiber Disintegrating Co., 18 Wall. 272, 21 L. Ed. 841, it was held that a suit in personam in admiralty was not a 'civil suit' within the eleventh section of the judiciary act, though clearly a civil suit in the general sense of that phrase, and as used in other sections of the same act. See, also, Re Louisville Underwriters, 134 U. S. 488, 10 S. Ct. 587, 33 L. Ed. 991. So, in Heydenfeldt v. Daney Gold & Silver Min. Co., 93 U. S. 634, 638, 23 L. Ed. 995, 996, it was said by Mr. Justice Davis: 'If a literal interpretation of any part of it (a statute) would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole,

it should be rejected. There is no better way of discovering its true meaning, when expressions in it are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced its enactment.' To the same effect is the Church of Holy Trinity v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226. * * *

"Two recent English cases are instructive in this connection: In Plumstead Dist. Bd. of Works v. Spackman, L. R. 13 Q. B. Div. 878, 887, it was said by the Master of Rolls, afterwards Lord Esher: 'If there are no means of avoiding such an interpretation of the statute' (as will amount to a great hardship), 'a judge must come to the conclusion that the Legislature by inadvertence has committed an act of legislative injustice; but, to my mind, a judge ought to struggle with all the intellect that he has, and, with all the vigor of mind that he has, against such an interpretation of an act of Parliament; and, unless he is forced to come to a contrary conclusion, he ought to assume that it is impossible that the Legislature could have so intended.' See, also, Ex parte Walton, L. R. 17 Ch. Div. 746.'"

[7] The case of Hennessey v. Wahlig, 155 La. 465, 99 So. 405, relied upon by the appellant, was not a suit for damages for alienation of the wife's affections. On the contrary, the plaintiff averred, and the court found and declared, that he had not lost his wife's love or affection; that she was secretly writing endearing notes to him; that she had not willingly left him, and was anxious to return and live with him, but was prevented by slander and by force and duress and threats by the defendants, her parents. The cause of action, which the court maintained, was slander. The defendants had injured the plaintiff in the estimation of his wife by saying, falsely, that he was the victim of tuberculosis and unfit to live with her. One of the defendants, as the court said, "applied the epithet of 'dirty consumptive dog,' if not a more abusive term." It is true that the learned author of the opinion in that case announced, by way of obiter dictum, that any

invasion of a husband's marital rights, whether by the parents of his wife or by an outsider, imposed upon the trespasser, by whose fault it happened, the obligation of repairing the injury. But the decision of a court of last resort is authority only for what the court decides. Hennessey v. Wahlig was decided during that brief period when the court was divided into sections, composed of only three Justices each, being less than a majority of the members of the court. Of the three Justices who took part in that decision one was serving only temporarily and another is not now a member of the court. There was no application for a rehearing in the case. Hence six of us had no opportunity whatever either to approve or to disapprove of anything that was said in the opinion rendered in the case. The court, therefore, is not committed to those expressions of opinion which were not at all necessary for the decision and which are quoted now as if pertinent to this case.

[8] Article 2324 of the Civil Code is not relied upon or referred to by the appellant. At first glance it seems pertinent, but in fact it is not. The article provides:

"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."

Assuming that the article refers not only to unlawful acts but to any wrongful act, it merely declares that the obligation of joint tort-feasors to make reparation in damages for their wrongful act is a solidary obligation. The law makes one who causes or procures another to do a wrongful act, or who assists or encourages the perpetrator, liable in damages to the same extent that the perpetrator is liable. The defendant in this case cannot be held liable under that article, for having caused or encouraged the plaintiff's wife to commit a wrongful act, because, as she is not answerable in damages for the offense, it is impossible for the defendant to be answerable in solido with her.

It is suggested, as authority for the proposition that article 2315 of the Civil Code gives the right of action in this case, that our predecessors took it for granted in the case of Stackpole v. Hennen, 6 Mart. (N. S.) 481, 17 Am. Dec. 187, in 1828, that the corresponding article (2294) of the Code of 1825 gave a right of action for damages for libel or slander, and that it was expressly so held in Carlin v. Stewart, 2 La. 73, in 1830. No reference was made to article 2294 of the Code of 1825 in Stackpole v. Hennen. The reason why it was taken for granted, without discussion, that the Code gave a right of action for damages for libel or slander was that article 3501 of the Code (article 3536 of the Revised Civil Code) mentioned the action for damages for libel or slander in the category of actions for damages for, offenses or quasi offenses, viz.:

"The actions for injurious words, whether verbal or written, and that for damages caused by slaves or animals, or resulting from offenses or quasi offenses."

In Carlin v. Stewart the court merely said:

"The appellee's counsel has referred us to the case of Stackpole v. Hennen, 6 Mart. (N. S.) 481 [17 Am. Dec. 187], in which the action of slander seems to be recognized by this court, and an act of the Legislature passed at the following session of the Legislature, bottomed on our decision. He has also cited the 21st and the 2295th articles of the Louisiana Code.

"It is useless in the present case to inquire whether the repeal of the civil laws by a late act of the Legislature extends to any other but statutory laws. The parts of the Code relied on would simply of themselves authorize our courts to sustain actions of slander."

The reference to the 21st article of the Code, in connection with the 2295th article, in the quotation from Carlin v. Stewart, is very

significant. The 2295th article of the Code of 1825 (which is article 2316 of the Revised Code) declares that every person is responsible for the damage he occasions not merely by his act but by his negligence, his imprudence, or his want of skill. The 21st article of the Code of 1825 (which has the same number in the Revised Code) declares that, in all civil cases, where there is no express law, the judge must proceed and decide according to equity, and that to decide according to equity means to resort to natural law and reason, and received usages. Now, if we refer to Moreau & Carleton's translation of the Partidas, vol. I, p. 51, and volume II, p. 1170 et seq., we find that the action for damages "caused by words, as by defamation," was one of the "received usages" expressly provided for in the third Partida, tit. II, law 31, and seventh Partida, tit. IX, in the category with actions for damages for trespass and for other offenses and quasi offenses.

[9] If we follow the example set by the court in Carlin v. Stewart, and decide this case according to natural law and reason and *received usages*, because of there being no positive law giving a right of action for damages for alienation of a wife's affections, we are bound to decide that there is no such right of action. What better evidence could we find of the natural law and reason and received usages on this subject than the fact that heretofore, in the 200 years of litigation, since Bienville founded the city of New Orleans and province of Louisiana, no one has ever attempted to assert such right of action?

The case before us, as disclosed by the averments of the petition, is not edifying. We doubt that it could withstand a demurrer in one of the common-law states where a right of action for damages for alienation of a wife's affections is granted, unless, perhaps,

165 LA.—7

where the minority rule prevails, that it matters not which one of the offending parties is the seducer. The facts disclosed, stated broadly, are that the plaintiff and the offending spouse were married in Arkansas nearly 16 months ago—less than five months before this suit was brought—and they soon after moved to New Orleans, where the plaintiff introduced his wife to his erstwhile friend, Monteleone. About three months later, plaintiff went away on a business trip, leaving his wife with a lady cousin of his. He corresponded with her daily, by letters and telegrams and telephone messages for 12 or 13 days, when she ceased replying, and his letters were returned unopened, bearing the postmark, "Removed." Meanwhile, Monteleone, it is alleged, had paid frequent visits and marked attention to Mrs. Moulin, entertaining her at suppers and drinking parties, at midnight clubs, cabarets, and gambling houses; at one of which midnight parties in a cabaret called "The Silver Slipper," it is alleged, "Mrs. Moulin became so hilarious that she disturbed even that boisterous place to such an extent that Monteleone took her away and returned with her about an hour and a half later." It is alleged that he induced her to ride to Baton Rouge with him in his automobile, and introduced her there as Mrs. Brown. Finally, it is alleged, he persuaded her to leave the house where her husband had left her and to go and live with him (Monteleone) in an apartment, where he supported and provided for her as his wife; so that, when plaintiff returned from his trip, and met his wife, she informed him that Monteleone "was in love with her," that she was intimate with him, and that she would no longer live with her husband. For all of which the plaintiff claims the sum of $80,000, itemized into four items of equal worth, viz.: $20,000 for the deprivation of the wife's

love and affection, and the loss of her fidelity and assistance; $20,000 for the loss of the companionship and society of the wife; $20,000 for the humiliation and mental anguish which the husband endured; and $20,000 for the breaking up of his home.

The best way to suppress such conduct as is described in the plaintiff's petition would be by means of a penal statute condemning both of the particeps criminis. A law that would allow the husband compensation in money for such a wrong would be revolting to a majority of men, and might tend more to encourage blackmail than to protect the home. It is not astonishing that the Civil Code makes no provision for such a right of action.

The judgment is affirmed.

LAND and BRUNOT, JJ., dissent.