# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-01304-SCT

*SANDRA DAVIS AND PORTER HORGAN*

*v.*

*JOHN DAVIS*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/16/2020 |
| TRIAL JUDGE: | HON. BARRY W. FORD |
| TRIAL COURT ATTORNEYS: | EDWIN L. BEAN, JR. |
| | TYLER BO SHANDY |
| | ANTHONY ANTONIO HEIDELBERG |
| | GREGORY MALTA |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BRAD RUSSELL BOERNER |
| | JOHN S. GRANT, IV |
| | JOHN S. GRANT, III |
| ATTORNEYS FOR APPELLEE: | EDWIN L. BEAN, JR. |
| | TYLER BO SHANDY |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 03/16/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     John and Sandra Davis, a then-married couple, had two children in the 1980s. In 2018, John discovered the possibility that the children were not biologically his, but that they may have been the biological result of Sandra's extramarital sexual relations with Porter Horgan. Almost immediately after discovering this possibility, John sued Sandra and Horgan for fraud, alienation of affection, and intentional infliction of emotional distress. A jury

ultimately awarded John $700,000 in damages. Because some of the claims are barred by the statute of limitations, and because John completely failed to request proper jury instructions on damages, this Court reverses the jury verdict and renders judgment in favor of Sandra and Horgan on John's claims against them.

## FACTS AND PROCEDURAL HISTORY

¶2.    John and Sandra Davis were married in 1979. John had two children from a previous marriage and had had a vasectomy. John testified that he had his vasectomy reversed in 1985. Two children were born during their marriage, Jared in 1987 and Becky in 1989. Both children were born in Louisiana, where the parties lived.

¶3.    In the late 1980s, Horgan pursued Sandra and they began having occasional unprotected sexual intercourse. Both testified that the relationship was sporadic and sexual, not emotional. At some point during the 1990s, Sandra began to work for Horgan, and did so at various intervals during the 1990s. Sandra estimated that the last time she and Horgan had sexual relations was in the late 1980s or early 1990s. Horgan testified that the affair had ended, at the latest, by 1997 or 1998, when he did not see her any longer in a business capacity.[1]

¶4.    Sandra testified that the marriage between her and John was never good. But John testified that, in the 1980s, he and Sandra were happily married. He testified that he had no

---

[1]The evidence does not indicate any ties between the state of Mississippi and Horgan's conduct. John does not point to any acts of Horgan whatsoever that would tie him to Mississippi. All parties lived and worked in Louisiana during the entirety of the affair. Had Horgan challenged personal jurisdiction over himself, he likely should have prevailed. *See Nordness v. Faucheux*, 170 So. 3d 454 (Miss. 2015). However, Horgan did not challenge personal jurisdiction, and has therefore waived it. M.R.C.P. 12(h)(1).

2

reason to believe that Horgan was interfering with his marriage in the 1980s. He further testified that, in the early 1990s, his marriage was good and that he had no reason to believe Sandra was having an affair. He further stated that their sex life was fine and that Sandra never seemed emotionally detached. He testified that he was shocked when Sandra left the marital home in 1999.

¶5. In 1999, John and Sandra separated, and their divorce was finalized in 2001. For approximately one year prior to the divorce, the family lived in Mississippi. Sandra was granted custody of the children, and John was ordered to pay child support in the amount of $838 per month. The divorce was finalized by a Louisiana court, but a Mississippi court decided custody and property issues. Sandra had filed an affidavit in the court stating that she and John were the parents of their two children. Sandra testified that John did not actually pay his child support, but that she never pursued contempt because she could not afford an attorney. Additionally, the children had trusts, which John emptied by selling the underlying assets and keeping the proceeds for himself.

¶6. In July 2018, John learned that Jared and Becky were possibly not his biological children. John's older daughter told John that Jared did not match with their family on 23andMe.[2] Then, Becky and John took DNA tests, which showed that they were not related.

¶7. In July 2018, John called Sandra to confront her and recorded the telephone conversation. During a heated conversation, John asked Sandra how she knew Horgan was

---

[2] 23andMe is a company from which a person can purchase a DNA collection kit, collect his own DNA, and send it to the company for analysis. https://www.23andme.com/howitworks/ (last visited Feb. 9, 2023).

the father, assuming in the question that she knew. She said that she did not know for a few years, and then she saw that Jared looked like Horgan. John asked her again how she knew the children were Horgan's. She replied that she did not really know, but she saw that they resembled Horgan physically, and she never checked their biological origin. Replying to John's questions regarding why she did not tell him, she responded that she "buried her head in the sand" and was scared. In the same conversation, John asserted that Sandra denied him sexual intercourse when she was having sexual relations with Horgan. The recording also indicated that John was frequently out of town. John also asserted more than once that Horgan's ex-wife was the "most" important person in the entire situation and must be told of the situation.

¶8.     On August 24, 2018, John filed a complaint against Sandra and Horgan. He alleged fraud against Sandra and alienation of affection against Horgan, and he also alleged that Sandra and Horgan were jointly and severally liable for fraud, alienation of affection, intentional infliction of emotional distress (IIED), and outrageous conduct. He asked for damages for alienation of affection, for allowing him to support Jared and Becky, and for "deceiving [him] into believing that those children were his own to where he developed a loving and bonding relationship with said children[.]"

¶9.     Sandra and Horgan moved to dismiss the complaint based on the statute of limitations and failure to plead fraud with particularity. The trial court denied the motion to dismiss and allowed John to amend his complaint regarding fraud. Trial was held on June 30, 2020.

¶10.    John first called Becky to testify. Becky testified that she remembered being picked

4

up from daycare by Horgan when she was about three years old and that she "feel[s] sure" it happened more than once, although she did not specifically remember it happening more than once. On cross-examination, she testified that it happened twice. Becky further testified that she and John had taken a DNA test at a laboratory and that the results stated that John was not her father. Becky also testified that she saw Horgan through about 1995. She did not see Horgan after Sandra stopped working for Horgan. Becky testified that throughout her life, Sandra contributed more to her financially than did John, but that John was also there for her and contributed financially.

¶11. Horgan testified next and could not remember many details about his sexual encounters with Sandra. He admitted that he made the advances, but that they never had an "affair" with flowers and hotel rooms. He clarified that the encounters were "a convenient, spontaneous, sexual attraction." He further testified that he did not remember picking Becky up from daycare, but that he would have picked up any child of an employee from daycare had his employee asked him to do so. Horgan also testified that he had no knowledge that he was potentially Jared and Becky's biological father until 2018.

¶12. Sandra testified that she did not know that Horgan was the biological father of her children, although she did understand that there was a possibility that he was. She also testified that the sexual encounters between her and Horgan were sporadic. She further testified that she contributed more financially to the children's upbringing than did John. Moreover, she testified that a woman told her that the woman and John had an affair during

5

Sandra and John's marriage.[3]

¶13. The jury was instructed regarding the elements of alienation of affection, IIED, and fraud. The jury instruction regarding fraud instructed that if the jury found the elements of fraud, it was "to return a verdict in favor of John Davis on his claim for Fraud and assess his damages, if any, in accordance with the other instructions from the Court." The jury instruction regarding IIED instructed that if the jury found the elements of IIED, it was "to return a verdict in favor of John Davis on the claim for the Intentional Infliction of Emotional Distress and assess his damages, if any, in accordance with the other instructions from the Court." John submitted instruction P-9, which allowed the jury to determine damages for both fraud and IIED. The defendants objected to combining the two claims in one instruction because they have different standards of proof. John voluntarily withdrew P-9 and did not offer any substitutes for it.

¶14. The alienation of affection jury instruction, regarding only Horgan, instructed the jury that if they found the elements of alienation of affection, "you may consider the following factors in determining the amount of damages, if any, to award John Davis *for alienation of*

_____

[3]John had other witnesses testify, but the details of their testimony are not relevant to the manner in which we resolve this case; therefore, a lengthy discussion of the testimony is not necessary. Summarily, employees of a private investigator agency and an employee of a DNA testing facility testified regarding gathering and testing DNA allegedly from Horgan. The collection methods, which did not involve gloves and involved multiple people directly handling the object tested, did not comport with the testing facility's guidelines. An economic expert also testified regarding the general cost of raising children, including college, but he did not factor in any specific facts of the case, including the fact that Becky and Jared were scholarship students. John's psychiatrist testified regarding his mental state. Lastly, John testified regarding losing his CPA license for stealing money from clients, as well as regarding other personal problems, which are not germane to our holding today.

*affection*[.]" (Emphasis added.)  The instruction listed:

     a.       John Davis' loss of love, affection, and companionship;

     b.       John Davis' loss of help, services, and physical assistance provided by his wife;

     c.       John Davis' loss of sexual relations with his wife;

     d.       John Davis' loss of the duties and responsibilities of making a home together; and

     e.       John Davis' mental and emotional distress caused by Porter Horgan's interference in his and Sandra Davis' marriage.

The jury circled "d" and "e."  The fourth question in the alienation of affection instruction, placed directly beneath these factors, then asked, "What are John Davis' damages, if any?"  The jury wrote "$700,000."  The trial court then awarded final judgment against Sandra and Horgan, jointly and severally, for $700,000.  The jury found against Sandra and Horgan on their cross-claims.[4]

¶15.    Sandra and Horgan filed post-trial motions, which the trial court denied.  Sandra and Horgan appeal, arguing that various statutes of limitations have run, that insufficient evidence supported the verdict, and that the damages award was flawed for various reasons.

## ANALYSIS

### 1.    *Alienation of Affection: Statute of Limitations*

¶16.    Statute of limitations issues are questions of law that this Court reviews de novo.  ***Est. of Puckett v. Clement***, 238 So. 3d 1139, 1144 (Miss. 2018).

¶17.    John's alienation of affection claim is solely against Horgan.  *See **Fitch v. Valentine***,

---

[4]Sandra and Horgan do not appeal the jury verdict regarding their cross-claims.

959 So. 2d 1012, 1018-19 (Miss. 2007) (The tort of alienation of affection provides a cause of action against a third party who interferes in a marriage.). Horgan argues that the statute of limitations bars this action against him, and, alternatively, that John failed to prove alienation of affection, particularly causation. John argues that this Court should overrule Court of Appeals precedent regarding the statute of limitations and hold that the statute of limitations for alienation of affection should accrue when the innocent spouse knew or should have known about the affair, applying the discovery rule to the tort. John maintains that failing to apply the discovery rule to the tort of alienation of affection is a result of "liberals . . . willing to stray from our laws that are based on Judo Christian principles which punish citizens of this state for crimes that are based on those principles, i.e. murder, rape, robbery, fornication, sexual battery of children, elderly abuse, etc." He claims that "[t]he family unit is being attacked by outside forces more so than any other time in our history with the proliferation of pornography, and social media. We have taken God out of our classrooms, school functions, and last but not the very least, the legal system."[5]

¶18.   The elements of the tort of alienation of affection are: "(1) wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) causal connection between such conduct and loss." *Saunders v. Alford*, 607 So. 2d 1214, 1215 (Miss. 1992). "The claim for this tort accrues when 'the alienation or loss of affection is finally accomplished.'" *Id.* (quoting *Overstreet v. Merlos*, 570 So. 2d 1196, 1198 (Miss. 1990)). The Court of Appeals has long held that claims of alienation of affection are governed by the three-year statute of

---

[5]John has been married three times.

limitations found in Mississippi Code Section 15-1-49. *Carr v. Carr*, 784 So. 2d 227, 230 (Miss. Ct. App. 2000).

¶19.    The Court of Appeals has held that the discovery rule does not operate to toll the statute of limitations in an alienation of affection case. *Fulkerson v. Odom*, 53 So. 3d 849 (Miss. Ct. App. 2011). The discovery rule provides that in actions "which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." Miss. Code Ann. § 15-1-49(2) (Rev. 2019).

> A latent injury is defined as one where the "plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question . . . [or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act."

*PPG Architectural Finishes, Inc. v. Lowery*, 909 So. 2d 47, 50 (Miss. 2005) (alterations in original) (quoting *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 168 (Miss. 1999)). "For an injury to be latent it must be undiscoverable by reasonable methods." *Id.* at 51. "Although a clandestine affair is a secretive wrongdoing, it is not unrealistic to expect a plaintiff to perceive, at the time of the affair, the resulting harm—the loss of consortium through alienation of the spouse's affection." *Fulkerson*, 53 So. 3d at 852-53. The Court of Appeals emphasized that, unlike in the abolished tort of criminal conversion, "the affair itself is not the harm." *Id.* at 853. "In contrast, alienation of affection requires loss of affection or consortium, an interest that 'is personal to the [husband] and arises out of the marriage relation.'" *Id.* (alteration in original) (quoting *Bland v. Hill*, 735 So. 2d 414, 418 (Miss.

9

1999)). "Because the injury is the detrimental change in the marriage relationship, it is reasonable for a spouse to discover the change in the marriage as it occurs." *Id.* Consequently, it is not unrealistic for a layman to perceive the injury at the time of the wrongful act. Indeed, a spouse must "exercise reasonable diligence concerning the state of his marriage . . . ." *Id.* The "discovery of the affair is irrelevant to the question of when [the] claim accrued . . . ." *Id.* at 852.

¶20. Like the plaintiff in *Fulkerson*, John "did not notice any changes or loss in his marriage during the time of the affair." *Id.* at 853. We adopt the reasoning of the Court of Appeals and hold that the discovery rule does not apply to the tort of alienation of affection. The tort requires loss of affection or consortium, an injury that is readily perceivable with reasonable diligence. Therefore, the trial court erred by failing to dismiss John's claim against Horgan for alienation of affection. This Court reverses the judgment of the trial court and renders judgment in favor of Horgan as to this issue.

### 2. Damages

¶21. Jury instructions are reviewed for an abuse of discretion. *Watkins v. State*, 101 So. 3d 628, 633 (Miss. 2012). The only damages that the jury was instructed to allocate were specifically for alienation of affection. John admits that the jury was not presented with a general verdict form "[t]hrough oversight on the part of the plaintiff's counsel and the court[.]" John was thus only awarded damages for alienation of affection. But the trial court held Sandra jointly liable for those damages, despite alienation of affection not being a viable claim against the offending spouse. *Fitch*, 959 So. 2d at 1018-19.

¶22.    A trial court is not obligated "to instruct the jury *sua sponte*, nor is a court required to suggest instructions in addition to those which the parties tender." ***Conner v. State***, 632 So. 2d 1239, 1254 (Miss. 1993), *overruled on other grounds by **Weatherspoon v. State***, 732 So. 2d 158 (Miss. 1999); ***Miss. Valley Silica Co., Inc. v. Eastman***, 92 So. 3d 666, 670-71 (Miss. 2012).[6]  A party is obligated to obtain proper instructions, and a party "can not assert error for his own omission." ***Ellington v. Eley***, 56 So. 2d 796, 799 (Miss. 1952).  John completely failed to request any instruction on damages for his fraud or IIED claims.  The only damages instruction offered was incredibly specific to alienation of affection, a claim that should have been dismissed and that we now reverse and render.  John voluntarily withdrew his other damages instruction without offering substitute instructions.  John's failure to request damages instructions does not warrant that he get a second bite at the apple.  Indeed, a failure to request an instruction generally bars or waives any corrections on appeal. *See **Materials Transp. Co. v. Newman***, 656 So. 2d 1199, 1203 (Miss. 1995).  Because the alienation of affection damages awarded is reversed, given that the alienation of affection claim is barred by the statute of limitations, and because the jury awarded no other damages, no damages can be transferred to the other claims against Sandra and Horgan.  The trial court did not abuse its discretion by failing sua sponte to grant a jury instruction regarding damages.  This Court therefore reverses the award of damages and renders judgment in favor of Sandra and Horgan as to John's claims against them because the jury did not award any damages for any potentially viable IIED or fraud claims.

---

[6]This is not a case in which the court refused an improperly worded instruction when it should have reformed it.  John simply did not submit a proper damages instruction.

### *3. Other Issues*

¶23. This Court need not address the issues of IIED and fraud. John only requested damages for, and the jury only awarded damages for, the alienation of affection claim. Because judgment is reversed and rendered as to that claim, the attendant damages are also reversed and rendered. The jury awarded no damages for the IIED and fraud claims; consequently, we decline to address those claims.

### CONCLUSION

¶24. Because the only claim for which the jury awarded damages was the alienation of affection claim and because the alienation of affection claim is barred by the statute of limitations, this Court reverses the jury verdict and the trial court's order denying Sandra and Horgan's post-trial motions and renders judgment in favor of Sandra and Horgan as to John's claims against them.

¶25. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. CHAMBERLIN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.**

**CHAMBERLIN, JUSTICE, SPECIALLY CONCURRING:**

"The time has come," the Walrus said.

(Lewis Carroll, "The Walrus and the Carpenter")

¶26. I agree with the majority opinion. I write separately, however, to call for the abolition of the antiquated common law tort of alienation of affection. Out of these fifty United States, only six—including Mississippi—continue to allow causes of action for alienation of

affection. All others have abandoned the tort, recognizing its means and purpose as no longer having a place in modern civilized society.

¶27.    The tort of alienation of affection has its roots in the belief that women were the property of their husbands and, as such, the husband had a common law right of action against the person who stole away his wife's affection. *See Moulin v. Monteleone*, 115 So. 447, 450 (La. 1927), *abrogated by 9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 234 (La. 1989). As public perception of the status of women changed, so did the underlying policy of the tort. Jamie Heard, Comment, *The National Trend of Abolishing Actions for the Alienation of a Spouse's Affection and Mississippi's Refusal to Follow Suit*, 28 Miss. C. L. Rev. 313, 315 (2009). Women gained property rights, the right to recover damages for their own personal injuries, and they were no longer viewed as legally inferior to the men in their lives. *Id.* The tort could no longer market itself as a man's right to compensation for the loss of his property. *Id.* So, the tort hired a PR firm and rebranded. *Id.* Now, it served to maintain and protect the integrity of marriages from outside interference and could be utilized by both partners in the marriage. *Id.*

¶28.    The long sought after marital harmony was not achieved by the significant rebranding of the tort. Instead, courts and legislatures in other jurisdictions began to recognize the tort as vindictive and punitive, promoting large settlements outside of court to avoid public disgrace as well as leading to large jury verdicts due to juries' inability to "dispassionately resolve the factual disputes in alienation suits in the same manner as other cases." *Fundermann v. Mickelson*, 304 N.W. 2d 790, 791 (Iowa 1981); *see also Magierowski v.*

13

***Buckley***, 121 A.2d 749, 756 (N.J. Super. Ct. App. Div. 1956). As aptly put by Justice Dickinson,

> the Missouri Supreme Court astutely noted, "When the reason for a rule of law disappears, so too should the rule." In Mississippi, though, the legal fiction that the common law tort of alienation of affections preserves a spouse's right to the mind and body of a partner continues to this day, only now it is masked as the means to stabilize the marital union.

***Fitch v. Valentine***, 959 So. 2d 1012, 1032 (Miss. 2007) (Dickinson, J., concurring) (citation omitted).

¶29. Further, even under current logic, the recognition of the theft of affection by a third party incorrectly implies that affection is the property of another. Also lost in this analysis is that, regardless of how it is categorized, nothing has been stolen. The affection has been consensually bestowed upon the third party. It seems axiomatic that, for a spouse so inclined, even if "a would-be paramour would be thereby dissuaded [by the threat of suit], a substitute is likely to be readily found." ***Fundermann***, 304 N.W.2d at 792. "Human experience is that the affections of persons who are devoted and faithful are not susceptible to larceny no matter how cunning or stealthful." ***Id.*** at 791; *see also* ***Russo v. Sutton***, 422 S.E.2d 750, 752 (S.C. 1992); ***Wyman v. Wallace***, 615 P.2d 452, 455 (Wash. 1980). Or, to put it more mundanely, it takes two to tango.

¶30. In response to the quickly dwindling number of states that allowed the cause of action to be brought, the Mississippi Supreme Court doubled down, stating "[w]e believe that the marital relationship is an important element in the foundation of our society. To abolish the tort of alienation of affections would, in essence, send the message that we are devaluing the

marriage relationship." ***Bland v. Hill***, 735 So. 2d 414, 418 (Miss. 1999); *see also **Fitch***, 959 So. 2d at 1019-20.

¶31.    But abolition of the alienation of affection tort would not send the message that this Court no longer adheres to the belief that the bonds of marriage are a sacred and societal good; rather, it would declare that this Court is ready and willing to step into the twenty-first century, to get aboard the runaway train and to recognize that the harm this tort inflicts on not only marital, but familial relationships, far outweighs any perceived good it could possibly accomplish. ***Bland***, 735 So. 2d at 422 (Smith, J., specially concurring). "Our courts should not be in the business of policing broken hearts." ***Id.*** at 427 (McRae, J., concurring in part and dissenting in part).

¶32.    Accordingly, I specially concur.

**GRIFFIS, J., JOINS THIS OPINION.**